# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

_____

No. 97-1297

_____

United States of America,  *
                           *
      Plaintiff - Appellee,                        *
                           *
   v.                           *
                           *
Francisco Padilla-Pena, aka Paco,                  *
                           *
      Defendant - Appellant.                       *


_____

Appeals from the United States

District Court for the

No. 97-1299

District of Nebraska.

_____

United States of America,  *

                           *

      Plaintiff - Appellee,                        *

                           *

   v.                           *
                           *
Ana Rosa Padilla-Pena, aka Ana,                    *
                           *
      Defendant - Appellant.                       *

_____

No. 97-1313

_____

United States of America,    *
                             *
        Plaintiff - Appellee,                          *
                             *
    v.                        *
                             *
Roberto Guzzman, aka Beto,   *
                             *
                             *
        Defendant - Appellant.   *

_____

No. 97-1316

_____

United States of America,    *
                             *
        Plaintiff - Appellee,                          *
                             *
    v.                        *
                             *
Luis A. Padilla-Pena, aka Ramone                       *
Pelone,                       *
                             *
        Defendant - Appellant.                          *

_____

No. 97-1320
_____

United States of America,   *
                            *
        Plaintiff - Appellee,                    *
                            *
    v.                      *
                            *
Angelica Padilla-Pena, aka Leka,                 *
                            *
                            *
        Defendant - Appellant.   *


_____

No. 97-1321
_____

United States of America,   *
                            *
        Plaintiff - Appellee,                    *
                            *
    v.                      *
                            *
Michael Padilla-Pena, aka Miguel,                *
                            *
        Defendant - Appellant.                   *

-3-

_____

No. 97-1323
_____

United States of America,   *
                            *
        Plaintiff - Appellee,                              *
                            *
    v.                      *
                            *
Artemio Esparza,                                           *
                            *
                            *
        Defendant - Appellant.                             *


_____


                            Submitted:  June 11,
1997

Filed:  November 6, 1997
                            _____

Before MURPHY, HEANEY, and JOHN R. GIBSON, Circuit
    Judges.

JOHN R. GIBSON, Circuit Judge.

    Luis Padilla-Pena, Francisco Padilla-Pena, Ana Rosa
Padilla-Pena, Angelica Padilla-Pena, Roberto Guzzman,
Michael Padilla-Pena, and Artemio Esparza appeal their
convictions of conspiracy to distribute heroin in
violation of 21 U.S.C. § 846 (1997), varying counts of
possession with intent to distribute heroin in violation
of 21 U.S.C.  § 841(a)(1) (1997), and the sentences

imposed upon them.[1]  All appeal their

---

[1]Luis Padilla-Pena was found guilty on one count of conspiracy to distribute and possession with intent to distribute, and five separate counts of possession and was sentenced to 330 months.  Francisco Padilla-Pena was found guilty on one count of conspiracy and five separate counts of possession and was sentenced to 240 months.  Ana Rosa Padilla-Pena was found guilty on one count of conspiracy and five separate counts of possession and was sentenced to 330 months.  Angelica Padilla-Pena was found guilty on one count of conspiracy and five separate counts of possession and was sentenced to 156 months.  Artemio Esparza was found guilty on one count of conspiracy and five separate counts of possession and was sentenced to 151 months.  Michael Padilla-Pena was found guilty of one count of conspiracy and two separate counts of possession and was sentenced to 151 months.  Roberto Guzzman was found guilty on one count of conspiracy and three separate counts of possession and was sentenced to 130 months.  All appellants' sentences were followed by a term of supervised release ranging from five to ten years.

convictions, arguing that the district court[2] erred in denying their motions to dismiss or to suppress the wiretap, and Michael Padilla-Pena and Roberto Guzman also argue that there was insufficient evidence to support their convictions. All appeal from the sentences imposed, arguing primarily that the district court findings as to quantity of drugs were insufficient. Ana Rosa Padilla-Pena also argues that the ruling that she was a manager or supervisor of the claimed conspiracy was in error, and Michael Padilla-Pena argues that the district court erred in not classifying him as either a minor or minimal participant in the conspiracy. In addition, Roberto Guzman appeals from a search and seizure of property at the time of his arrest, arguing that it was not done pursuant to valid consent. We affirm the judgments and convictions.

During the summer and fall of 1994, Officer Mike Terrell of the Omaha Police Department made several undercover buys of black heroin. Over the next six months, Terrell made additional purchases of black heroin ranging from one gram up to four and one-half grams, for total purchases of between thirty and thirty-five grams. Two confidential informants also made purchases. When one of the informants made purchases, a person identified as Hector would sometimes be present, and on at least two occasions Hector was present when the other informant made purchases. Hector

---

[2]The Honorable Lyle E. Strom, Senior United States District Judge for the District of Nebraska.

was Luis Padilla-Pena. It developed that Tracy Jefferson had come to Omaha on behalf of Luis Padilla-Pena sometime in October 1993, with the general objective of establishing a heroin distribution center. Officer Terrell was ultimately led to a house leased by Francisco Padilla-Pena, and in September 1994, permission was obtained to install pen registers on the telephones in that location. On November 22, 1994, a state judge signed an order authorizing a wiretap on a telephone at the house leased to Francisco Padilla-Pena. Between November 23, 1994, and January 16, 1995, agents intercepted some 4,000 calls. The wiretap, undercover buys, and other information led to seventeen defendants being indicted for involvement in a heroin distribution conspiracy.

Of those indicted, only the seven appellants now before us proceeded to a bench trial. The others entered guilty pleas, including Tracy Jefferson, who testified for the government. More than sixty witnesses testified, and 250 exhibits were received during the bench trial lasting twenty days. All appellants were found guilty of those counts of the indictment described above, and substantial sentences were imposed.

Further facts will be recited as is necessary in our analysis of the issues presented by the appellants.

**I.**

Before trial, appellants moved the court to dismiss or, alternatively, suppress all

evidence obtained from the wiretap.[3]  The district court denied these motions,[4] and all appellants assert that the district court erred.

Appellants argue that the government[5] failed to minimize the intercepted conversations as required under 18 U.S.C. § 2518(5) (1997), which requires that the government conduct electronic surveillance "in such a way as to minimize the interception of communications not otherwise subject to interception."  When assessing whether the government properly minimized under 18 U.S.C § 2518(5), the court must determine if the government's actions were objectively reasonable in light of the facts and circumstances of the case.  See Scott v. United States, 436 U.S. 128, 137–38 (1978); United States v. Williams, 109 F.3d 502, 507 (8th Cir.), cert. denied, 1997 WL 592459 (Oct. 14, 1997).  The reasonableness of the government's actions is a question of fact, and therefore we review the district court's denial of the motion to suppress the wiretap evidence for clear error.

_____

[3]Although appellants filed separate motions, all were considered joint movants on the motion at the suppression hearing.  Luis Padilla-Pena and Roberto Guzzman briefed the issue and made essentially identical arguments.  Ana Rosa Padilla-Pena, Angelica Padilla-Pena, Michael Padilla-Pena, and Artemio Esparza adopt the arguments as briefed by Luis Padilla-Pena.

[4]At the conclusion of a three day suppression hearing, the Honorable Thomas D. Thalken, United States Magistrate Judge for the District of Nebraska, concluded the motions should be denied.  The district court adopted his conclusion.

[5]The investigation of the heroin conspiracy involved the Omaha Police Department, the Federal Bureau of Investigation, and the Immigration and Naturalization Service.  We have referred to these organizations collectively as "the government".

<u>United States v. Fregoso</u>, 60 F.3d 1314, 1321 (8th Cir. 1995); <u>United States v. Garcia</u>, 785 F.2d 214, 224 (8th Cir. 1986).

After reviewing the record, we conclude the district court did not clearly err in its findings and therefore affirm its denial of the motion to suppress the wiretap

evidence.

Before activating the wiretap, the government anticipated that most of the intercepted conversations would be in English. However, once the wiretap was activated, the majority of the intercepted conversations were in Spanish. Because the government had not procured Spanish speaking monitors before activating the wiretap, it recorded the Spanish conversations for after-the-fact minimization until an adequate number of Spanish speaking monitors could be obtained to contemporaneously minimize the Spanish calls.

Appellants argue that the government should have known that Spanish conversations would be intercepted and unreasonably failed to obtain Spanish monitors before activating the wiretap so as to contemporaneously minimize the Spanish calls. They argue that because the government should have contemporaneously minimized the Spanish calls, after-the-fact minimization was not appropriate, and therefore evidence obtained from the recorded conversations should be suppressed.

In support of this argument, appellants point to evidence that all undercover buys were made from Hispanics, the government overheard the suspects conversing with each other in Spanish, the government knew that some of the suspects were illegal aliens from Mexico, and the government knew a possible source of the heroin was Mexico. Appellants argue that, given this information, the only reasonable conclusion to be drawn was that many of the intercepted conversations would be in Spanish.

The government maintains that, despite this evidence, it reasonably believed the intercepted calls would be in English and, therefore, was justified in not obtaining Spanish monitors before activating the wiretap. It points out that the pre-wiretap investigation focused on heroin sales in north Omaha between the suspects and English speaking whites and African-Americans. In addition, undercover agents conversed with the suspects in English, not Spanish, when making undercover buys. Having

heard the suspects speak English when making heroin transactions, the government maintains it reasonably believed the suspects would use English when conversing on the phone.

When examining the issue of whether the government may perform after-the-fact minimization, it should be noted that contemporaneous minimization is not required under all circumstances, particularly when a foreign language is involved.  See United States v. David, 940 F.2d 722, 729-30 (1st Cir. 1991).  Where intercepted conversations are in a foreign language and, despite the exercise of reasonable diligence a translator is not available for contemporaneous minimization, minimization may be accomplished as soon as practicable after interception.  Id.; 18 U.S.C. § 2518(5).

After reviewing the record, we are not persuaded that the district court clearly erred in rejecting appellants' argument that the government unreasonably failed to procure Spanish monitors before activating the wiretap. There was evidence the government believed the pertinent calls would be in English.  For this reason, Spanish monitors were not "readily available" at the inception of the wiretap.  Therefore, after-the-fact minimization, which is expressly allowed by 18 U.S.C § 2518(5), was appropriate.

In addition, appellants argue that after the wiretap was activated and the government realized that most of the calls were in Spanish, the government unreasonabl\y delayed in obtaining Spanish speaking monitors to perform contemporaneous minimization.  Appellants claim that the

-12-

government had many Spanish-speaking individuals on staff, but unreasonably failed to have them monitor the conversations. Appellants also claim that even if Spanish interpreters were not immediately available, the government should have shut down the wiretap and waited until such monitors were available.

Appellants' argument that the government was required to shut down the wiretap until Spanish monitors could be obtained is without merit. If interpreters are not available, shutting down the wiretap is not required. After-the-fact minimization is expressly allowed in such circumstances. 18 U.S.C. § 2518(5). The government does not need to show that contemporaneous minimization was impossible. David, 940 F.2d at 730. Rather, the government must show that, despite reasonable efforts, Spanish monitors were not available. Id.; 18 U.S.C § 2518(5). This has been shown.

Once the need for Spanish monitors was ascertained, the government attempted to immediately obtain Spanish speaking monitors from various local and nationwide agencies and departments. However, because those that could speak Spanish had other assignments and duties, Spanish speaking monitors were not immediately available. Despite the shortage of Spanish speakers available, the government was able to obtain a few Spanish monitors two to three weeks after activating the wiretap, and eventually obtained sufficient Spanish speakers to monitor the wire full-time. Considering the government's reasonable efforts to obtain Spanish speaking monitors, we conclude that the district court did not clearly err in finding that the government's after-the-fact minimization of Spanish conversations was appropriate.

Finally, appellants argue that the government did not conduct the after-the-fact minimization in a reasonable manner. Appellants argue that Spanish monitors often listened to entire taped conversations. Additionally, appellants argue that the government should have erased

-14-

from the tapes all non-pertinent conversations.

Unquestionably, after-the-fact minimization must be performed reasonably. See Scott, 436 U.S. at 139-42. For after-the-fact minimization to be reasonable, the government must utilize a process that protects the suspect's privacy interest to approximately the same extent as properly conducted contemporaneous minimization. David, 940 F.2d at 730.

The government's procedures in this case have accomplished this. If Spanish monitors were not available to contemporaneously minimize Spanish calls, the government would record the Spanish calls for later translation and transcription. Spanish interpreters were instructed to stop listening and transcribing the conversation once they determined the conversation was beyond the scope of the investigation. If the conversation did not appear to be related to narcotics, the translators would fast- forward through the tape to the next conversation.

Occasionally, monitors would listen to and transcribe conversations not related to narcotics. However, the fact that the monitors occasionally intercepted non-pertinent conversations does not warrant suppression of the evidence derived from the wiretap. Section 2518(5) does not forbid the interception of all nonpertinent conversations, but rather instructs agents to conduct surveillance in such a manner as to "minimize" the interception of such conversations. See Scott, 436 U.S. at 140. Whether the agents have properly conducted the wiretap in such a manner depends on the facts and circumstances of each case. Id.

In Scott, the Supreme Court concluded that suppression was not required even though government agents intercepted virtually all conversations, including non-narcotics related conversations. Id. at 141. Scott stated, "In a case such as this, involving a wide-ranging conspiracy with a large number of participants, even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the

calls before they were completed." Id. at 142.

As in Scott, the investigation in this case involved a widespread conspiracy requiring extensive surveillance to determine the precise scope of the enterprise. Also as in Scott, many of the calls not related to narcotics that appellants argue were improperly minimized were either short or ambiguous in nature. In a case such as this, it is not uncommon for a conversation to end before a monitor can determine if the call is narcotics related. In this case, the recorded calls were treated similarly to the

contemporaneously minimized calls.  Whether minimization was performed contemporaneously or after-the-fact, agents would stop listening once they determined the call was not narcotics related.  Considering the facts and circumstances of the case, we conclude the district court did not err in finding that the agents did not act unreasonably in listening to entire recorded conversations of many non-narcotics related calls.

We also conclude that there is no merit to appellants' contention that all conversations not related to narcotics should have been erased.  To the contrary, recorded conversations should not be erased. See 18 U.S.C. § 2518(8)(a); United States v. Maldonado-Rivera, 922 F.2d 934, 954 (2d Cir. 1990).  The government's policy of fast-forwarding through non-narcotics related conversations was appropriate.

Appellants also contend that the government's wiretap minimization procedures violated Neb. Rev. Stat. § 86-705(6) (Reissue 1994).  Having determined that the government agents acted reasonably in their efforts to comply with the minimization requirements of 18 U.S.C. § 2158(5), we need not consider this argument.  We have consistently held that evidence obtained in violation of a state law is admissible in a federal criminal trial if the evidence was obtained without violating the Constitution or federal law.  See United States v. Olderbak, 961 F.2d 756, 760 (8th Cir.1992).

**II.**

**A.**

Both Roberto Guzzman and Michael Padilla-Pena contend that there is insufficient evidence to support their convictions.

In reviewing the sufficiency of the evidence to support a guilty verdict, we view the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict.  We then uphold the conviction only if

it is supported by substantial evidence. United States v. Black Cloud, 101 F.3d 1258, 1263 (8th Cir. 1996); see also Glasser v. United States, 315 U.S. 60, 80 (1942).

Neither Guzzman nor Michael Padilla-Pena disputes the existence of a conspiracy to distribute heroin involving at least some of the defendants in this case. Thus, we need only determine whether they participated in the conspiracy. Once the government proves the existence of a drug conspiracy, "only slight evidence linking the defendant to the conspiracy is required to prove the defendant's involvement and support a conviction." United States v. Jenkins, 78 F.3d 1283, 1287 (8th Cir. 1996) (quotation omitted).

**B.**

In this case, the evidence is sufficient for a reasonable fact finder to conclude that Roberto Guzman was involved in the conspiracy to distribute heroin. The district court found Guzman to have been a party to one or more wiretapped conversations in which aspects of the heroin business were discussed. The content of the conversations strongly indicates the speakers' knowledge and involvement in a common drug distribution scheme. For example, in one conversation, the topics of discussion include the interdiction of a co-conspirator, the weighing of heroin, and the distribution of "the Snow White kind," presumably heroin. Guzman's primary contention regarding these conversations is that, because no witness was able to identify his voice on the wiretap, he was never properly shown to be a party to any of the

intercepted conversations. Voice identification, however, was unnecessary in determining that Guzzman was one of the speakers. In the intercepted conversations themselves, Guzzman is addressed by the other parties both by his legal name and by his nickname, "Beto."

The evidence against Guzzman is further strengthened by the discovery of heroin, balloons, a digital pager, and a large amount of cash in the apartment where

Guzzman was arrested. Guzzman was the only person in the apartment at the time of the arrest. On its own, Guzzman's presence in the apartment with the heroin and the related items is highly suggestive of his role in the heroin business. When this evidence is combined with the information from the intercepted conversations, the evidence is more than enough to support the conviction for conspiracy to distribute heroin.

The evidence also supports the conviction of Guzzman for possession of heroin with intent to distribute. Guzzman correctly asserts that "mere presence" is insufficient to support a conviction for possession. See United States. v. Dunlap, 28 F.3d 823, 826 (8th Cir. 1994). In this case, however, there is more than Guzzman's "mere presence" in the apartment. The evidence establishes a number of different factors from which a reasonable inference of possession could be drawn. Guzzman appears to have been the only one staying at the apartment at the time of the arrest and so had control over the premises. Additionally, law enforcement officers discovered heroin under a crumpled sleeping bag in one bedroom, while the other bedroom did not appear to be in use.

The evidence also indicates Guzzman's close association with the actual renters of the apartment was directly related to the distribution of heroin. As discussed, the content of the intercepted conversations provides strong evidence that Guzzman is a member of the same conspiracy as the named tenants. Further, a close relationship can be inferred from the very fact that the tenants allowed Guzzman to stay alone in the apartment

with the easily discoverable drugs and cash.  We conclude the evidence outlined above is enough to support the conviction for possession.

## C.

Michael Padilla-Pena also argues that there is insufficient evidence to convict him.

First, Michael Padilla-Pena argues that co-defendant Tracy Jefferson, the only witness to implicate him in any criminal activity, is so unreliable that due process requires that her testimony not be relied upon. In support of this contention, Michael points to Jefferson's self-admitted history of drug use, prostitution, dishonesty, and mental health problems. He further points to Jefferson's plea agreement with the government which provides that she will receive a portion of any funds seized as the result of information she provides. While Jefferson's personal history and potential bias may invite some skepticism towards her testimony, the district judge was in a much better position to consider these factors and to weigh her overall credibility as a witness. She was found to be a credible witness, and we conclude there is no clear error in this determination.

Michael Padilla-Pena also argues that, even considering Jefferson's testimony, there is insufficient evidence to convict him. Jefferson testified that in early 1993 she was sent by Luis Padilla-Pena from Denver, Colorado, to meet Michael in Seattle, Washington, to start a heroin distribution business. Michael met Jefferson at the airport and then drove her to downtown Seattle, where she and Michael attempted to sell heroin to local drug addicts. For five days, Michael and Jefferson distributed heroin in the downtown area. Jefferson then returned to Denver. No further witness testimony was presented by the prosecution tying Michael to the conspiracy.

Although Jefferson's testimony concerned events in early 1993, the third superseding indictment alleged that

the conspiracy began on or about August 19, 1994. Because the Seattle incident occurred well before August 19, 1994, Michael argues that Jefferson's testimony is too remote to be sufficient proof of guilt.

The district judge, however, did not conclude that Michael was a member of the conspiracy based on Jefferson's testimony. Rather, the judge relied on a December 11, 1994 intercepted telephone conversation between Michael and Angelica Padilla-Pena in determining that Michael was a member of the conspiracy. In that telephone

conversation, Michael discussed with Angelica finances and debts of the heroin business. In addition, Michael discussed his debts to a man named Memo, who, according to Jefferson, controlled the money and drugs coming in and out of Denver. The judge found that this telephone call "compel(s) the court to find that it establishes through his own words, his own conversation, that he knew the purpose and intent of this conspiracy and that at least by that date, which is December 11, 1994, he had become a member."

We conclude this evidence, viewed in a light most favorable to the government, is sufficient for a reasonable fact finder to believe that Michael was a member of the conspiracy. We decline to disturb the district court's finding.

## III.

Roberto Guzzman argues, contrary to the findings of the magistrate judge as adopted by the district court, that the search of the apartment at 3201 Thirtieth Street, Des Moines, Iowa, was without voluntary consent, and that the fruits of the search should be suppressed. We review a finding of voluntariness under a clearly erroneous standard. See United States v. Payne, No. 95-4136, 1997 WL 377988, at *6 (8th Cir. July 10, 1997). The question of whether a consent to a search was voluntary is "question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).

Guzzman argues that a number of circumstances

surrounding the search prevented his consent from being voluntary. Some of the facts behind these circumstances are undisputed. On January 17, 1995, five law enforcement officers in plain clothes arrived at the Des Moines apartment with a purpose of conducting a consent search. When the officers arrived, Guzzman was not fully dressed. At some point during this visit, Guzzman was arrested for being an illegal alien. At no point did the officers inquire into Guzzman's educational background or previous experience with

law enforcement.  Based on Guzzman's alleged consent, the law enforcement officers searched the apartment.  As a result of the search, law enforcement officers found heroin and approximately $2,640 in cash inside the apartment.  Guzzman signed neither a consent form nor any form indicating that he understood his <u>Miranda</u> rights.

Guzzman argues that the number of police officers, his state of partial dress, his lack of familiarity with police procedures, his limited ability to speak English, and the lack of a signed consent or <u>Miranda</u> form all indicate the absence of voluntary consent. Considering the record as a whole, however, we do not believe that these circumstances justify a conclusion that the district court clearly erred in finding Guzzman's consent to be voluntary.

Indeed, upon closer study of the record, many of these circumstances were much less dramatic than they may first appear.  As the government points out in its brief, though five officers arrived at the Des Moines apartment, at least two appear to have remained out of Guzzman's sight until after the search had already begun.  Guzzman was partially dressed when the officers arrived, but they allowed him to finish dressing when he asked to do so.  At the suppression hearing, INS Agent Martin Biesemeyer and two other officers testified that Biesemeyer at first spoke to Guzzman in Spanish, but that Guzzman would often choose to answer Biesemeyer's questions in English. Therefore, Guzzman's limited ability to speak English does not appear to have diminished his ability to give informed consent.

Guzzman also argues two circumstances which the government directly disputes. First, Guzzman appears to challenge whether <u>Miranda</u> warnings were delivered by describing the testimony on this issue as "contradictory." The most relevant testimony on the issue is Agent Biesemeyer's testimony at the suppression hearing. Biesemeyer testified that he read Guzzman his <u>Miranda</u> rights in Spanish. As a result, the other officers, who did not speak Spanish, could neither confirm nor deny Biesemeyer's account of the conversation.

Guzzman argues that Biesemeyer's testimony concerning the _Miranda_ warnings was internally contradictory. Guzzman appears to be referring to two particular portions of Biesemeyer's testimony. In the first portion, Biesemeyer testified that he "advised [Guzzman] that he was under arrest." When asked what happened next, Biesemeyer testified that he and Guzzman began talking about who owned the apartment. In the second portion of testimony, Biesmeyer stated that he advised Guzzman of his _Miranda_ rights immediately after the arrest. These portions are not so contradictory as to require us to conclude that the district court clearly erred in assessing Biesemeyer's credibility.

Second, Guzzman argues that Agent Biesemeyer knew Guzzman was a resident alien and that the arrest for being an illegal alien was both unreasonable and a mere pretext for the real purpose of searching the apartment. Specifically, Guzzman refers to Biesemeyer's testimony at the suppression hearing that Biesemeyer had reviewed Guzzman's INS file before going to the Des Moines apartment. Biesemeyer testified, however, that Roberto Guzzman was a common name in the INS index system, and so he could not be sure if Guzzman was the same person as in the file. In addition, Biesemeyer stated that Guzzman identified himself as an illegal alien.

The district court, upon the magistrate judge's recommendation, found that Biesemeyer had probable cause to arrest Guzzman after Guzzman stated he was an illegal alien. If true, Guzzman's claim of illegal status combined with Biesemeyer's uncertainty about Guzzman's specific identity would be a sufficient basis for such a

finding.  Thus, Guzzman's challenge to the propriety of his arrest for being an illegal alien is really a challenge to the district court's assessment of Biesemeyer's credibility.  We are particularly hesitant to find clear error in the district court's findings of fact where those findings are based on determinations of witness credibility.  <u>See</u> <u>Anderson v. Bessemer City</u>, 470 U.S. 564, 575 (1985).  As Biesemeyer's testimony supports the arrest, and we do not conclude such testimony to be clearly erroneous, we reject Guzzman's argument.

## IV.

Luis, Ana Rosa, Angelica, Francisco, and Michael Padilla-Pena all argue the evidence was insufficient to establish the quantity of the drugs involved in the sentencing determinations.  The government acknowledges that it bears the burden of establishing the drug quantities by a preponderance of the evidence.  See United States v. Buford, 108 F.3d 151, 155 (8th Cir. 1997).  The district court's specific findings in support of its sentencing determinations, however, must be reviewed only for clear error.  See United States v. Flores, 73 F.3d 826, 833 (8th Cir.), cert. denied, 116 S. Ct. 2586.  In determining base offense levels, the district court may rely on evidence including drug prices and organizational capabilities to approximate total drug quantities beyond the amount of drugs actually seized.  See U.S. Sentencing Guidelines Manual § 2D1.1, application note 12 (1995).  Further, a sentencing judge who presides over a trial is entitled to base his findings of fact on the trial record.  See United States v. Wiggins, 104 F.3d 175, 178 (8th Cir. 1997).

Luis and Ana Rosa Padilla-Pena were both held accountable for substantially all of the drug quantity attributed to the conspiracy.  For sentencing purposes, a criminal defendant convicted as a co-conspirator is held responsible for all reasonably foreseeable acts undertaken in furtherance of the conspiracy.  See U.S.S.G. § 1B1.3(a)(1)(B) (1995).  The district court found both Luis and Ana Rosa to be central figures in the conspiracy, a finding which is firmly grounded in the evidence.  Thus, both could be reasonably expected to foresee the bulk of

the conspirators' activities.  As a result, the sentencing court assigned both Luis and Ana Rosa a base offense level reflecting a drug quantity of ten to thirty kilograms of heroin and methamphetamine.

In determining this quantity, the district judge relied heavily upon the trial testimony of Tracy Jefferson.  Jefferson testified that, through Luis, she arranged to purchase methamphetamine from two unidentified men in California.  Jefferson stated

that she purchased the methamphetamine in amounts of one kilogram but could not recall the total number of purchases she made from the men. As a result, the judge estimated these purchases to total only two kilograms. Jefferson testified that she also purchased methamphetamine from Ana Rosa on more than one occasion. The judge estimated these purchases to total two kilograms as well.

Jefferson also testified that, while living in the cities of Denver, Colorado and Omaha, Nebraska, she helped cut and package approximately twenty-five grams of heroin a day. By extrapolation, the judge determined that at least twenty-five grams a day of heroin was processed over the two years from Jefferson's arrival in Denver in January 1993 until the arrest of the defendants in January 1995. Such a rate of production would result in a total quantity of heroin which by itself would be well within the ten to thirty kilogram range. This estimate is based upon the processing of heroin which Jefferson witnessed in individual cities, while the overall drug conspiracy actually encompassed several cities at a given time. Therefore, we conclude that the judge's method of determining the quantity of heroin was reasonable.

The district judge, however, did not rely solely on this one method to estimate the quantity of heroin. Instead, the judge corroborated his findings by analyzing additional evidence. This evidence included the amounts of money seized from the conspirators as well as Jefferson's testimony concerning both the amounts of heroin she had transported from California to Omaha and the daily volume of sales required to maintain a heroin

market in a given city.

Luis, along with several of the other appellants, challenges the reliance of the district court on Jefferson's testimony as to drug quantities.  As we have previously discussed, Jefferson's credibility was a matter best determined by the district judge.  Here, the judge found Jefferson to be credible on the issue of drug quantity, based in part on the availability of evidence which substantiated much of her testimony.  We find no clear error in this determination.

Angelica Padilla-Pena was assigned a base offense level reflecting a drug quantity of three to ten kilograms of heroin. Angelica contends that the evidence ties her only to money involved in the conspiracy and not to the drugs themselves. As a result, she claims that she could not have reasonably foreseen that the conspiracy involved three to ten kilograms of heroin. The government responds that Angelica was a knowing and willing member of the conspiracy and was well aware of the conspiracy's involvement in the heroin business.

Although Angelica was never personally found in possession of drugs, her ability to foresee a drug quantity of at least three kilograms of heroin is well established by the evidence. Angelica was in Omaha from June 1994, until January 1995. The district court estimated that during that time period the conspiracy had processed from four to six kilograms of heroin in that city. During an interdiction stop in Las Vegas, law enforcement officers seized approximately $27,000 in cash from Angelica who was traveling from Omaha to Ana Rosa's home in Southern California. In a subsequent phone call, Angelica told her brother Francisco that, of the money seized, $10,500 was for "the food." Francisco responded that he was not upset and would only be upset if she was caught with the "food." At trial, the law enforcement agent who transcribed the call testified that, based on his experience in translating wiretapped conversations, he believed that Angelica and Francisco were referring to narcotics. Angelica was also identified as a party to additional intercepted phone conversations in which money and the heroin business were discussed. From this evidence, the district court could conclude that Angelica

was aware of both the nature and scope of the conspiracy to distribute heroin. Therefore, we conclude the district court did not clearly err in determining Angelica's base offense level.

Like Angelica, Michael Padilla-Pena was assigned a base offense level reflecting a quantity of three to ten kilograms of heroin. Because the court could not establish that Michael was a member of the conspiracy prior to December 11, 1994, Michael

argues that the only amount of heroin that can reasonably be attributed to him is 1.5 kilograms.

We reject this argument. The district court found that Michael could reasonably have foreseen three kilograms. The court found that Michael was in close contact with Ana Rosa in California, whom the district court considered to be one of the two "cornerstones" of the operation. In addition, based on Michael's telephone conversation with Angelica in which he discussed the heroin business, the court found that Michael was aware of the heroin activities in Omaha, Nebraska in December 1994, which alone involved heroin in excess of three kilograms. Three to ten kilograms is established by the evidence, and there is no error in the base offense level determination.

Francisco Padilla-Pena was sentenced to the mandatory minimum term of twenty years for possession with intent to distribute, pursuant to 21 U.S.C. § 841(b)(1)(A) (1997). A defendant convicted under § 841 must serve a minimum term of twenty years if the underlying violation involved at least one kilogram of a substance containing a detectable amount of heroin and the defendant has a prior conviction for a felony drug offense. In this case, the existence of a prior conviction is uncontested. For reasons including Francisco's involvement in the Omaha operations and his close contact with co-conspirators, the district court found that Francisco could have reasonably foreseen at least one kilogram of heroin. There is no clear error in that determination.

### V.

Ana Rosa Padilla-Pena argues that the district court incorrectly applied United States Sentencing Guideline § 3B1.1(b), as her role could not be fairly characterized as a manager or supervisor.  The essence of her argument is that she did no more than perform errands when directed by her brothers, and she denies that there were large

sums of money or quantities at her house.  She argues that she was little more than a "gofer."

Section 3B1.1.(b)provides, "If the defendant was a manager or supervisor . . . and the criminal activity involved five or more participants or was otherwise extensive, increase by three levels."  The application notes following § 3B1.1 additionally specify, "To qualify for an adjustment under this section, the defendant must have been the . . . manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1, application note 3 (1995).

Because Ana Rosa admits that the alleged conspiracy involved more than five participants, the only issue before us is whether she could properly be characterized as having managed or supervised one or more other participants.  The district court's determination of a participant's role in the offense is a factual finding which we review for clear error.  <u>Flores</u>, 73 F.3d at 835.

We have no difficulty affirming the district court's determination that Ana Rosa was a central member of the conspiracy and not a mere "gofer."  The district judge, who presided at trial, found that Ana Rosa "was indeed the bank, as it were, for both the money and the heroin."  The judge also found Ana Rosa to be the principal supplier of the methamphetamine which Tracy Jefferson transported from California to Omaha.

These findings by the district court are amply supported by the evidence.  Tracy Jefferson testified

that, as part of the conspiracy, she made at least eight trips to California to obtain heroin.  She stated that on each trip she would meet Ana Rosa and give Ana Rosa money in exchange for the heroin.  Jefferson also testified to purchasing one kilogram quantities of methamphetamine from Ana Rosa.  Wiretapped telephone conversations reveal that, when Angelica Padilla-Pena was arrested with over $27,000 on her person, Angelica was on her way to meet with Ana Rosa.   In other intercepted conversations, Ana Rosa discussed both money and co-conspirators with her brother

Francisco. In light of this evidence, it is clear to us that Ana Rosa was central to the conspiracy and had significant control over major aspects of the heroin business.

The closer question is whether Ana Rosa managed or supervised other participants in the conspiracy as opposed to managing only property or activities. If the evidence does not support the finding that Ana Rosa managed or supervised other participants, then her offense level could only be increased by means of a departure and not by means of an adjustment. See U.S.S.G. § 3B1.1, application note 3 (1995). As this court stated in United States v. McFarlane, 64 F.3d 1235, 1239 (8th Cir. 1995), "[t]he difference between these two devices is not inconsequential." While an adjustment is mandatory, a departure is, to a certain degree, discretionary. Id. Thus, we would need to remand to allow the district court to exercise that discretion.

After careful review of the record, however, we hold there is enough evidence to find that Ana Rosa managed and supervised at least one other in the conspiracy. First, we note that although Ana Rosa's management of assets and activities does not equate with the control of participants, we can consider it as evidence of power within the criminal organization. The intercepted calls and Jefferson's testimony make clear that Ana Rosa maintained immediate possession of much of the criminal organization's money and drugs. There is no evidence that Ana Rosa reported to anyone else in California. As the district court stated, "She is the one who was the leader . . . insofar as California is concerned." From this

combination of autonomy and control over assets, the district court could reasonably infer that Ana Rosa had the leverage and discretion necessary to direct other participants in the conspiracy.

In addition, there is evidence that Ana Rosa actually exercised that discretion. When Jefferson came to California to purchase heroin, it appears Ana Rosa was the one who determined where the transactions would take place. In an intercepted phone conversation, Ana Rosa and Angelica discussed the ownership of money in Angelica's possession. Ana Rosa told Angelica that $10,000 belonged to Luis and that another

conspirator should receive only $2,500 despite having asked for $5,000.  In an aside, Angelica repeated these instructions to someone else who was in the room with her. In short, when a question arose as to the ownership of money, Ana Rosa decided the issue in instructions to Angelica, who accepted Ana Rosa's authority.

The evidence supports a finding that Ana Rosa had decision-making authority within the conspiracy and exercised that authority by directing both Tracy Jefferson and Angelica Padilla-Pena.  Accordingly, we cannot conclude the district court clearly erred in applying § 3B1.1(b).

## VI.

Michael Padilla-Pena argues that the district court erred in declining to classify him as either a minimal or minor participant pursuant to § 3B1.2 of the Sentencing Guidelines.  He argues that there is no evidence he actively participated in the conspiracy and, at most, he was merely aware of the conspiracy. He argues this, along with the fact that there is little evidence against him in comparison to the other defendants, supports his contention that he was a minimal or minor participant in the conspiracy.

A district court's determination as to whether a defendant is a minimal or minor participant is a question of fact that may be reversed only if clearly erroneous. United States v. Field, 110 F.3d 587, 590 (8th Cir. 1997).

Section 3B1.2 provides for a reduction in the offense

level of minimal and minor participants in criminal endeavors. A minimal participant must be "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G § 3B1.2, application note 1. A "defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." <u>Id.</u> The downward adjustment for a minimal participant should

be "used infrequently" and is "appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to off load part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs." Id., application note 2.

A minor participant is "any participant who is less culpable than most other participants, but whose role could not be described as minimal." Id., application note 3. The mere fact that a defendant is less culpable than his codefendants does not entitle defendant to "minor participant" status. United States v. West, 942 F.2d 528, 531 (8th Cir. 1991). Whether a downward adjustment is warranted is determined not only by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable, but also by measuring each participant's individual acts and relative culpability against the elements of the offense. United States v. Goebel, 898 F.2d 675, 677 (8th Cir. 1990).

Although the amount of evidence against Michael Padilla-Pena is small as compared to the other defendants, we are not convinced that he is "plainly among the least culpable of those involved" or clearly "less culpable than most other participants." The amount of evidence against a defendant does not necessarily correspond to the defendant's level of culpability.

Evidence was presented which demonstrated that Michael Padilla-Pena not only had knowledge of the conspiracy, but actively participated in heroin

distribution. Tracy Jefferson testified that she was sent to Seattle to start a heroin distribution center, and while there she and Michael attempted to distribute heroin. Although not charged with this conduct, the distribution of heroin in Seattle is relevant conduct for purposes of determining his sentence. In addition to distributing heroin, evidence was presented that Michael discussed with Angelica Padilla-Pena his debts in the family heroin business. The district court considered this evidence and determined that Michael was

neither a minimal nor minor participant in the conspiracy. We conclude this determination was not clearly erroneous.

## VII.

For the foregoing reasons, the judgment of the District Court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.