**UNITED STATES, Appellee,**

v.

**Damian FERRERAS, Defendant, Appellant.**

**No. 97–2101.**

United States Court of Appeals, First Circuit.

Heard Aug. 5, 1999.

Decided Sept. 15, 1999.

Alan Scribner, by appointment of the Court, for appellant.

Zechariah Chafee, Assistant United States Attorney, with whom Margaret E. Curran, United States Attorney, was on brief, for appellee.

Before TORRUELLA, Chief Judge, LIPEZ, Circuit Judge, and FUSTÉ,* District Judge.

TORRUELLA, Chief Judge.

Appellant Damian Ferreras ("Ferreras") was charged with possession with intent to distribute over fifty grams of cocaine base in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(A). The district court heard testimony on Ferreras's motion to suppress the physical evidence seized in his apartment. and, on the same day, the court denied the motion. Subsequently, the case was tried before a jury and Ferreras was convicted of the sole count on which he was tried. At the sentencing hearing, the government produced testimony that the cocaine base was crack. The district court found that the substance was crack and sentenced Ferreras on that basis. Ferreras was sentenced to 121 months imprisonment and five years of supervised release. As a condition of supervision, Ferreras was ordered to surrender at the completion of his term of imprisonment to the Immigration and Naturalization Service for deportation proceedings. This appeal followed.

## BACKGROUND

The following facts were adduced at trial. On February 19, 1997, at 4:30 p.m., detectives from the Providence Police Intelligence Bureau went to the vicinity of 30 Pekin Street, Providence with a search warrant for the second floor apartment at that address. 30 Pekin Street is a three story tenement house. The detectives saw Damian Ferreras's car parked in front of the house. Damian Ferreras came out of a side door of the house and got into the car. The detectives stopped the car down the street and told Ferreras that they had a search warrant for his apartment. An electronic pager was seized from Ferreras and he and his car were brought back to the house.

At the house, a detective used a key from the key ring taken from the ignition of Ferreras's car to open the side door of the building. A team of detectives went to the second floor and searched the bedrooms, kitchen, and bathroom for narcotics. Detectives Edward Leste and David Lussier went up the stairs to the attic where three bedrooms had been constructed. Detective Lussier used a key from Ferreras's key ring to unlock one of the bedroom doors. In a small closet in this bedroom Detective Leste found a pair of high leather boots. From one of the boots he withdrew a clear plastic bag which held 101.74 grams of cocaine base. The detective, who has extensive experience in seizures of crack cocaine, recognized the cocaine base as being the lumpy, rocklike substance known as crack. From the boot he also pulled $1,750 in cash. Searching the room further, the detective found, in a frame for a stereo speaker, an electronic digital scale of a type commonly used to weigh narcotics. On top of the frame the detective found several pieces of personal paperwork bearing the name of Damian Ferreras, including recent court documents. The detectives testified that pagers, quantities of cash, electronic scales, and drugs, taken together, are common elements of drug sales operations.

The bedroom had one bed mattress on a box spring and a young man's clothing in the closet. There was no indication that anyone other than Ferreras stayed in the bedroom. Ferreras was brought to the Providence Police Station where he was escorted to the Intelligence Bureau Office. He was informed of his Miranda warnings in Spanish and English and questioned by Detective Lussier. Ferreras told the detective that the boots found in his closet by Detective Leste had been bought by Ferreras on Canal Street in New York City. He said that the apartment where he was staying belonged to his mother, that he slept in the upstairs bedroom periodically, and that he had last slept in the bedroom

* Of the District of Puerto Rico, sitting by designation.

two nights previously but had spent the last night at his girlfriend's place. Ferreras went on to say that the money in the boot belonged to him, but that the drugs belonged to another man, for whom Ferreras was holding the drugs. Ferreras said he did not know the name of the other person but could call him on the telephone.

The crack seized from the boot was analyzed at the Rhode Island Drug Chemistry Laboratory and tested positive for the presence of cocaine base. The drugs weighed 101.74 grams (3.58 ounces). The detectives testified from their experience that the value of crack was about $1,000 to $1,200 per ounce and that this quantity of crack was definitely intended for distribution.

Ferreras moved to suppress the physical evidence on grounds that the search of the third floor exceeded the scope of the warrant. The government entered into evidence the search warrant, the complaint, and the affidavit.

The face of the affidavit showed that Detective Edward Leste of the Providence Police Department had information from a reliable informant that Damian Ferreras "is storing and selling cocaine from his apartment located at 30 Pekin Street, 2nd floor apt., and also storing cocaine in the basement...." The affidavit described 30 Pekin Street in Providence as a "2 ½ story dwelling and being grey with white trim in color."

The affidavit further showed that Detective Leste, within a few days prior to February 19, 1997, had sent an informant into 30 Pekin Street to buy cocaine. The informant came out with cocaine and said that he had bought it from Damian Ferreras while inside the second floor apartment.

On February 19, 1997 a state court judge issued a warrant to search for cocaine, drug sale paraphernalia, and drug money. The search warrant stated:

Place and person to be searched:

30 Pekin Street, 2nd floor apartment and basement

Damian Ferreras, John Doe, dob–2–21–75.

Later that day a Providence Police raid team went to execute the warrant at 30 Pekin Street. Ferreras walked out of the house, got into a car, and drove down the street. He was stopped by the police and brought back to the building he had just left along with a set of keys from the ignition of the car he had been driving. The police used a key from the ring to enter a side door on the ground floor of the building.

Just inside the entrance there was a door leading to the cellar and a flight of stairs up to the second floor. At the top of the stairs was a door with a lock. The door opened into a small hallway on the second floor, and was closed but not locked.

About five feet to the right of the stairway door was a locked door which the police opened with a key from Ferreras's key ring. Through this door, the police entered living quarters on the second floor including a kitchen, two bedrooms, a bathroom, and a living room. About eight feet across the vestibule from the door to the second floor living quarters another set of steps led to the attic. There was no door at the bottom, or at the top of the steps from the second floor hallway to the attic.

In the attic the police saw a hall with three rooms in a row on the left-hand side. These rooms appeared to have been recently constructed and not part of the original building. The first room's door was closed and locked and a detective opened it with another key from Ferreras's key ring. Inside was a box-spring and mattress and a closet full of a man's clothes. Inside a boot the police found the over 100 grams of crack. There was also a television set with a cable leading through a hole in the floor to the second story.

The second room also had a bed and appeared to have been lived in. The third one had only a mattress. The right-hand side of the hallway was divided into two

unfinished rooms which were still under construction and revealed plaster, sheetrock, tools, dirty floors, and in one room a metal can of urine. There was no sink, shower, bathtub, kitchen, refrigerator, stove, or pantry, and no running water anywhere in the attic. There was a space heater in one of the attic rooms. The only access to the attic was via the set of steps from the small hallway on the second floor. A detective examined the electric meters on the exterior of the building and found that one was for the first floor apartment, and the other for the second floor. There was none for the attic.

Ferreras called his brother Victor Ferreras who testified that on February 19th there was a door at the foot of the steps leading to the attic, that there was a working sink and toilet in the attic, and that there had been a shower but that he had dismantled it before the date of the raid. Victor Ferreras said that he had been manager of the property and that his brother and another man lived in the attic. He said his mother lived on the second floor but had been away in the Dominican Republic on the day the police entered.

In rebuttal the government entered into evidence the testimony of a defense investigator given at a bail hearing on the case on March 6, 1997. That investigator testified that he had examined the attic just after the police raid and had not seen a bathroom.

The district court found that Victor Ferreras's testimony was not credible. Based on the facts described by the police, the court found that the attic and second floor were all one apartment. He thus found that the search of the attic was within the scope of the search warrant.

At sentencing, Ferreras argued that the substance that was identified by the chemist as cocaine base at trial was not the form of cocaine base known by the street term "crack." The government called as its witness Sargent David Lussier who had served nearly eleven years on the Providence Police force. During his tenure on the force he had been involved in hundreds of investigations of crack cocaine trafficking, including seizures of the drug and arrests of those trafficking it. He had participated in a number of law enforcement courses, including a two week school run by the Drug Enforcement Administration, during which he had studied aspects of drug investigations. Lussier explained how crack is prepared, based on his instruction at school. At the hearing he examined the cocaine base which had been seized from Ferreras's boot and noted that it was hard, lumpy, and brown. He said that those were the characteristics of crack cocaine and gave his opinion that the substance was crack. On cross-examination he further described the substance as crack based on "the feel, the texture, the sight, everything I know about the subject. . . ."

The court declared that it was satisfied "from all the evidence in the case" that Ferreras had possessed crack cocaine and imposed the minimum sentence of imprisonment within the applicable guideline range, 121 months, as requested by the government.

## DISCUSSION

### I. The Suppression Motion

On appeal, Ferreras challenges the district court's denial of his suppression motion, contending that the search of the attic at his 30 Pekin Street residence violated the Fourth Amendment. His argument is without merit.

Our review of a district court's decision to grant or deny a suppression motion is plenary. *See United States v. McCarthy*, 77 F.3d 522, 529 (1st Cir.1996). "We defer, however, to a district court's factual findings if, on a reasonable view of the evidence, they are not clearly erroneous." *United States v. DeMasi*, 40 F.3d 1306, 1311 (1st Cir.1994). A clear error exists only if, after considering all the evidence, we are left with a definite and firm

conviction that a mistake has been made. *See United States v. McLaughlin,* 957 F.2d 12, 17 (1st Cir.1992). Moreover, we will uphold a district court's decision to deny a suppression motion provided that any reasonable view of the evidence supports the decision. *See United States v. Garcia,* 983 F.2d 1160, 1167 (1st Cir.1993).

■ The Fourth Amendment serves to protect the individual's interest in privacy. Any search intruding upon that privacy interest must be justified by probable cause and must satisfy the particularity requirement, which limits the scope and intensity of the search. *See United States v. Bonner,* 808 F.2d 864, 867 (1st Cir.1986). When investigators fail to limit themselves to the particulars in the warrant, both the particularity requirement and the probable cause requirement are drained of all significance as restraining mechanisms, and the warrant limitation becomes a practical nullity. *See id.* The concern here is the particularity requirement's limitation on the area to be covered by the search operation.

■ The authority to search granted by any warrant is limited to the specific places described in it, and does not extend to additional or different places. *See id.* at 868. However, "search warrants and affidavits should be considered in a common sense manner, and hypertechnical readings should be avoided." *Id.* For example, warrants authorizing a search of "premises" at a certain address authorize a search of the buildings standing on that land. *See id.* (citing *United States v. Williams,* 687 F.2d 290, 293 (9th Cir.1982); *United States v. Meyer,* 417 F.2d 1020, 1023 (8th Cir.1969)). This Court has held that a warrant authorizing a search of "the premises known as a single family trailer ... with attached carport," also authorized the search of a disabled car, parked adjacent to the carport, and a birdhouse hanging from a tree about fifteen feet from the trailer steps. *See United States v. Asselin,* 775 F.2d 445, 447 (1st Cir.1985).

In *United States v. Heldt,* 668 F.2d 1238, 1265 (D.C.Cir.1981), the language "suite of offices of Mr. Heldt" was given just as broad an interpretation as "premises" was given in *Asselin.* The court looked at the question of whether or not a free-standing office, not mentioned in the warrant, belonging to a person who did not work for Heldt, could reasonably have been viewed by the searching agents as constituting part of "the suite of offices of Mr. Heldt." *See Heldt,* 668 F.2d at 1263. The office was reasonably considered by the searching agents as part of, or even appurtenant to, the "properties" to be searched. *See id.* at 1265; *see also United States v. Principe,* 499 F.2d 1135 (1st Cir.1974) (where warrant authorized search of particular apartment in a building, and cabinet was three to six feet away from entrance to apartment in small hallway opposite door to apartment, officers executing search warrant could reasonably suppose cabinet was appurtenant to apartment).

Just as in *United States v. Bonner,* 808 F.2d 864, 868 (1st Cir.1986), where we held that even though Bonner's "detached two car garage" had never been mentioned in the description of places to be searched, it would have been reasonably considered within the scope of the warrant, the search of the attic at 30 Pekin Street must be reasonably considered part of the area intended to be searched.

■ When one reached the second floor apartment at 30 Pekin Street, there was a door with a lock (although at the time of the search, the door was closed but not locked). The door opened into a small hallway on the second floor. In this hallway, about eight feet across the vestibule from the door to the second floor living quarters, another set of steps led to the attic. There was no door at either the bottom or the top of the steps securing access to the attic.

It is clear from the evidence that the attic was not independent from the second floor living quarters. Cable television was supplied to the attic by a cable through a hole in the floor to the second story.

While three of the rooms in the attic had either a mattress or a bed, two rooms in the attic were unfinished and contained sheetrock, tools, dirty floors, and a metal can of urine. There was no sink, shower, bathtub, kitchen, refrigerator, stove, food, or running water in the attic. While there was an electric meter for the first floor, and one for the second floor, there was none for the attic.

Given that: (1) the attic was open to the second floor, but not to the street or the first floor apartment; (2) the third floor was not equipped for independent living; and (3) the occupant of the third floor had access to the second floor kitchen and bathroom, the district court's finding that the two floors were all one apartment, and conclusion that the search warrant for the second floor apartment included the half story above it is eminently reasonable and supported by the evidence.

## II. Sentencing

■ Ferreras contends that the government failed to prove that the 101.74 grams of cocaine base seized from the apartment was in fact crack cocaine. He complains that the government produced no evidence as to the water solubility of the cocaine base. In light of our opinion in *United States v. Martinez*, 144 F.3d 189 (1st Cir. 1998), his contentions are meritless.

In *Martinez*, we rejected an almost identical challenge. *See id.* at 190. We held squarely that, once the government laid a proper foundation "by introducing a chemical analysis proving that, chemically, the contraband was cocaine base," *id.* at 190 (quoting *United States v. Robinson*, 144 F.3d 104, 109 (1st Cir.1998)) (ellipses omitted), no further scientific evidence was needed. Instead, the government could bridge the evidentiary gap between cocaine base and crack cocaine by presenting lay opinion evidence (or an opinion proffered by an expert who possessed practical as opposed to academic credentials) from "a reliable witness who possesses specialized knowledge" (gained by experience in dealing with crack or familiarity with its appearance and texture). *See id.; see also*

*Robinson*, 144 F.3d at 108–09. *Martinez* and *Robinson* are controlling here.

As in *Martinez*, Ferreras posits that the government failed to introduce testimony as to the water solubility of the cocaine base. That statement is true as far as it goes, but it does not take Ferreras very far. Water solubility is of no assistance in distinguishing among forms of cocaine base. *See Martinez*, 144 F.3d at 190. As we wrote in *Robinson*, 144 F.3d at 108–09: "Chemical analysis cannot distinguish crack from any other form of cocaine base because crack and all other forms of cocaine base are identical at the molecular level. Thus, no further scientific testimony would have been of any conceivable assistance. . . ."

In this case, as in *Martinez* and *Robinson*, the government adduced competent scientific evidence from a chemist to prove that the 101.74 grams of contraband associated with Ferreras's arrest was cocaine base. Given the witness's qualifications, his opinion constituted competent proof of the fact that the substance was cocaine base.

Once the government introduced the chemical testimony, no additional scientific evidence was needed. From that point forward, as in *Martinez* and *Robinson*, competent lay testimony, such as that of Detective Leste, remarking on the substance's distinctive appearance and texture and identifying it as crack, completed the final link in the evidentiary chain. *See Martinez*, 144 F.3d at 190.

We need say no more, no less. In *Robinson*, we stated that "[o]n the strength of [such] proof, and in the utter absence of any controverting evidence," the district court's finding "easily survive[d] clear-error review." *Robinson*, 144 F.3d at 109.

## CONCLUSION

For the reasons stated above, we **affirm**.