# United States Court of Appeals
## For the First Circuit
_____

No. 98-2046

UNITED STATES,

Appellee,

v.

JOSEPH A. CHARLES, a/k/a SHIZ,

Defendant, Appellant.

_____

No. 98-2180

UNITED STATES,

Appellee,

v.

ELIZABETH AHART,

Defendant, Appellant.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

_____

Before

Torruella, Chief Judge,

Cyr, Senior Circuit Judge,

and Stahl, <u>Circuit Judge</u>.

_____

Kevin Reddington for appellant Joseph A. Charles and Frances L. Robinson, by appointment of the Court, for appellant Elizabeth Ahart, were on consolidated brief.

Thomas C. Frongillo, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, Dickens Mathieu, Assistant United States Attorney, and Geline W. Williams, Special Assistant United States Attorney, Plymouth County District Attorney's Office, were on brief, for appellee.

_____

May 24, 2000

_____

TORRUELLA, **Chief Judge.** On April 24, 1997, a federal grand jury returned a three-count indictment charging Joseph A. Charles, Elizabeth Ahart, and Reynard Mason with violations of various federal narcotics and firearms laws. After unsuccessfully litigating a motion to suppress all evidence arising out of a wiretap authorized by a Massachusetts court, see United States v. Charles, No. 97-10107-PBS, 1998 WL 204696 (D. Mass. Jan. 13, 1998), Ahart and Charles entered conditional pleas of guilty. On July 17, 1998, after holding an evidentiary hearing to determine the nature of the narcotics, the district court sentenced Ahart and Charles to 168 months of imprisonment. This appeal followed.[1]

For the reasons stated below, we affirm.

## BACKGROUND

The district court aptly summarized the facts in this case. See id. at 1-5. We see no need to duplicate that effort. Accordingly, we reiterate the district court's findings of fact largely verbatim.

## I. State Criminal Investigation and Proceedings

### A. An Overview

From 1992 through 1995, the Massachusetts State Police conducted an investigation of individuals based in the City of Brockton who were suspected of engaging in the distribution of large quantities of crack cocaine. On July 24, 1995, the police initiated a state-

---

[1] Reynard Mason is not a party to this appeal.

court-authorized wiretap on the telephone located at 21 Field Street, a single family home in Brockton where defendants Charles and Mason were residing. A week-long wiretap investigation yielded over 800 interceptions, the majority of which pertained to the purchase and distribution of crack cocaine. As a result of information gleaned from the wiretap, state police executed consecutive search warrants at 21 Field Street and 26 Allen Street, the Brockton apartment of defendant Ahart. From the latter search, the police seized approximately 221 grams of cocaine base, drug paraphernalia, an Uzi rifle, ammunition, and $1,576 in U.S. currency. In August of 1995, a state grand jury indicted Charles, Ahart, and Mason on various state drug and firearm offenses.

### B. Wiretap Warrant and Order

On July 18, 1995, the Plymouth County District Attorney's Office secured authorization from an associate justice of the Superior Court (Cowin, J.) to intercept communications into and out of 21 Field Street. The application for the wiretap warrant was submitted with a fifty-page affidavit of State Trooper Anthony Thomas, which formed the basis of the court's probable cause determination that narcotics transactions were being conducted by way of the telephone line into the home.

In addition to the named targets of the investigation, the application sought permission to intercept the calls of defendant

Charles's attorney, John W. Kelley, though nothing in the accompanying affidavit suggested that Kelley was suspected of criminal activity. According to Trooper Thomas, he told Judge Cowin that the application was unusual in that it sought to intercept phone calls between Charles and Kelley in order to determine whether the conversations were privileged.

The July 18 court order as initially drafted contained a Minimization Notice which prohibited the interception of "privileged communications." In accordance with the wiretap application, however, it also provided that if any conversations with John W. Kelley of Brockton were intercepted, the police could listen for 30 seconds to determine whether the contents were privileged; if the wiretap monitor on duty determined that the communications were not privileged, the interception would be allowed to continue "an additional 30 seconds, unless and until the conversations become privileged," at which time the monitoring would cease.

On July 21, three days after issuing the order, the state judge sua sponte amended her order. The "Amended Minimization Notice" eliminated the 30-second window that allowed the police lead time to determine whether the content of a phone call was privileged and specifically prohibited the interception of communications with Attorney Kelley. The order read as follows:

> The officers executing this warrant shall not
> intercept any conversations between persons at
> the target telephone and incoming callers whom
> the officers know, or have reason to believe,
> have an attorney-client relationship with the
> person to whom they are speaking.  This order
> shall include any telephone conversations between
> Attorney John W. Kelley of Brockton and Joseph A.
> Charles, if the intercepting officers know or
> have reason to believe the speaker is the said
> Attorney Kelley.  There shall be no interception
> of outgoing telephone calls to . . . the office
> number of Attorney John W. Kelley . . . .

The amended order contained no information regarding Kelley's residential telephone.

## C.  Intercepted Phone Calls

The wiretap ran from July 24, 1995 to July 30, 1995.  At issue in this appeal are the events of July 29.  Trooper Paul Petrino was the sole officer on monitoring duty in the State Police Middleboro barracks from midnight on Friday, July 29 until 8 A.M. the following morning.  Petrino had experience in monitoring wiretaps and in narcotics investigations generally, but had not played any part in the Charles investigation prior to July 28, 1995.[2]  Instead, he had been assigned to a highly publicized and intense investigation involving the murder of a state trooper.

---

[2]  There is some confusion in the record regarding whether Petrino served as a monitor on July 28 as well as July 29.  The government's trial brief stated he was a monitor only once, on July 29; however, both the duty log and testimony before the district court indicated that Petrino served on July 28 as well.

As required of all monitoring officers, Petrino signed the minimization order on July 25, 1995, when he was first assigned monitoring duties in this case. He did not, however, re-sign or review the order prior to July 28 or July 29, when he actually began working on this case. Prior to his monitoring assignment, Petrino had never discussed the particulars of the Charles investigation with Trooper Thomas, the officer in charge of the wiretap; nor did he have any knowledge of any role Attorney Kelley played in the investigation, including any suspicions harbored by Thomas of Kelley's involvement. Specifically, Petrino had no knowledge that Kelley had been included in the original minimization order and was later removed by amendment; and he had no recollection of ever having met or spoken with Kelley.[3]

At the evidentiary hearing, Trooper Petrino explained the process of how calls were monitored from the Middleboro listening post in some detail. For each call made to and from the 21 Field Street telephone line, the monitoring equipment would display the number that was dialed and begin recording. Upon a determination that a call was non-privileged, monitors would enter information into a computer identifying the parties, nature, and substance of each call in order to create a log of all interceptions. Upon a determination that a call

---

[3] Kelley testified at the state suppression hearing that he had "met" Petrino prior to the date of the hearing. When pressed on cross-examination, however, Kelley admitted to having no specific memory of ever being introduced to Petrino or ever having directly spoken to Petrino in any capacity.

was a privileged communication, monitors were instructed to minimize the call by turning the tape off, signified in the log by the notation "TTO" (Turn Tape Off). In the event that a series of calls were made in rapid succession, or when the noise of the pen register made it difficult to hear the conversations, monitors were instructed to jot down the gist of each of the calls in handwritten notes and later play back the tapes to make complete entries into the log. Monitors were also instructed to contact Trooper Thomas directly upon intercepting any incriminating phone calls.[4] While two monitors were ordinarily assigned to the listening post on any given shift throughout the course of the wiretap, Petrino served as the lone monitor during his eight-hour shift on July 29 because all other law enforcement personnel were needed to execute the search warrant that was anticipated for that night.

Within the first two hours of his shift, between 1:20 and 1:55 A.M., Petrino intercepted seven calls in quick succession; these calls mainly involved Mason reassuring callers that Charles would soon be returning home from a short trip to New York City. This period was followed by a fifty minute break without any incoming or outgoing calls. From approximately 2:46 A.M., upon returning home from his

_____

[4] That a call was designated incriminating versus nonincriminating would be reflected in the log by the notations "I" or "N." Other columns within the log reflect the time the call was dialed, the number dialed, and whether the call was incoming or outgoing, signified by the notations "I" or "O."

trip, Charles made a series of six calls within eight minutes. During the first of this series, Petrino's entries in the log reflect Charles reporting to an unidentified male, "it was a good night got 6 keys," inquiring "how much to bring," and instructing him to call his "boy" and have him bring "12 g's." This series of calls and the previous series had been in such rapid succession that Petrino had to play back the tapes to make his log entries. Petrino immediately paged Thomas and informed him of the incriminating interception.

At approximately 3:12 A.M., the police entry team executed a search warrant at 21 Field Street. Expecting to find the cocaine referred to in the intercepted calls, the police found no drugs at all, recovering only a handgun and $4,500 in cash from a car registered to defendant Ahart. Charles was not arrested and the police left the premises just before 5:00 A.M. Because it was a dry run, Thomas told Petrino that the phones were likely to be active. The primary objective was to identify the location of the narcotics.

Immediately following the search, from 4:59 to 5:05 A.M., Charles made a series of five phone calls relating the events that had just taken place. Petrino described this six minute monitoring period as "extremely busy." At 5:05 A.M., Charles dialed a number that was neither listed in the amended minimization notice nor known to Trooper Petrino. When a man answered, Charles said, "Hello, Mr. Kelley, I'm

sorry for calling the house so late. This is Joseph. Yo, I got some problems, man." Describing the police search, he continued:

> Mr. Tony Thomas and them just ran up in my fucking house . . . [t]hey ain't found nothing, though. The only thing they found was a firearm, but he didn't charge me with that. But he took my money out of the trunk of my car.

The conversation lasted approximately four minutes. Charles and Kelley discussed the possibility of recovering the seized money in court on Monday and suing the police, and the two agreed to speak again after the weekend. As the call was being recorded, Petrino did not hear the words "Mr. Kelley" and did not minimize the conversation. Following standard procedure for the interception of nonprivileged calls, Petrino initially jotted down notes and later played back the tape several times to enter into the computer the substance of the conversation and other pertinent information. "Mr. Kelley" was Charles' attorney, John W. Kelley, so named in the minimization order. The call was to Kelley's home in Easton rather than his office in Brockton.

Upon completion of his shift at 8:00 A.M., Petrino went home and went to bed. According to his testimony before the district court, he was oblivious to the fact that he had failed to comply with the wiretap order. Later that morning, Thomas returned to the Middleboro barracks to check the log from Petrino's shift. Thomas testified that in reviewing Petrino's entries, he noticed the 5:05 interception, and

that Charles had spoken with "a male named Kelley." Thomas recognized that the number dialed was an Easton number and knew that Attorney Kelley resided in Easton. Upon tracing the number and verifying that it was indeed the home telephone line of Attorney Kelley, Thomas called Petrino at home to inquire about the intercepted phone call. While Petrino recalled the interception, Petrino told Thomas he did not know that the person he identified in his log as "a male named Kelley" was, in fact, Charles' attorney, John Kelley. Thomas believed it was a good faith mistake.

Thomas immediately informed his supervisor, Sergeant Nagle, of the interception. Nagle was located at the listening post at the time he received the call from Thomas, and responded to the news by writing in large script across the chalkboard in the monitoring room, "No Attorney Calls." Thomas also notified his commander, Lt. Bruce Gordon, who in turn notified the case prosecutor on Sunday, July 30, after the wiretap and investigation had been terminated. Thomas's actions conformed with the Amended Minimization Notice, which required that "[a]ny inadvertent interception of a privileged communication must be reported forthwith to the officer in charge, Trooper Anthony E. Thomas, Jr., and the supervising Assistant District Attorney, Geline W. Williams." The police did not inform the Superior Court of the violation of the minimization order because they believed they were not required to do so once the wiretap terminated.

-12-

That same day, subsequent to the interception of the conversation between Charles and Kelley, the police intercepted two incriminating conversations between Charles and Ahart at approximately 9:24 A.M. and 9:55 A.M., which resulted in the execution of the Allen Street search warrant and the subsequent arrests of defendants Charles, Ahart, and Mason. All subsequent, post-arrest calls to Kelley and other counsel were properly minimized.

## II.  Federal Criminal Proceedings

### A.  Dismissal of the State Court Indictment & Initiation of Federal Proceedings

The defendants were initially indicted by a Plymouth County Grand Jury in August 1995 for narcotics-related offenses. On March 18, 1997, after a hearing,[5] an associate justice of the Superior Court (DelVecchio, J.) issued a memorandum and order suppressing the entire wiretap and all physical evidence derived therefrom based on Trooper Petrino's interception of the July 29, 1995 privileged Charles/Kelley phone call. See Commonwealth v. Charles, Nos. 96995-96997, 96998-97000, slip op. at 13-14 (Plymouth Super. Ct., Mar. 18, 1997). The state court found that "the government deliberately attempted to intercept a private communication between Kelley and Charles in direct contravention of the attorney-client privilege" and that "in light of this finding, an across-the-board suppression of all evidence derived

---

[5] The transcript of that hearing was submitted to the district court and is part of the record in this case.

from the wiretap is appropriate." Id. at 13.  On March 19, 1997, the Commonwealth filed a notice of appeal.

That same day, the Plymouth County District Attorney's Office contacted the United States Attorney's Office to review the case with the Federal Bureau of Investigation (FBI) for possible federal prosecution.  The United States Attorney's Office decided to file federal charges based upon the FBI's recommendation and the following factors: (1) the large quantity of drugs allegedly involved; (2) the dangerous nature of crack cocaine; (3) the large number of unindicted members of the suspected drug organization, as indicated by intercepted phone conversations; (4) the defendants' alleged use of firearms, including an Uzi semi-automatic firearm with an obliterated serial number; (5) the criminal records of defendants Ahart and Mason; (6) defendant Mason's apparent propensity for violence; (7) evidence that the drug conspiracy dated back to at least 1992; (8) the broad scope of the enterprise, including evidence of a drug supplier in New York City and confederates in Boston and Brockton; (9) the likelihood that defendants would continue to engage in drug trafficking if acquitted on state charges; and (10) the significant problems that Brockton had suffered in recent years due to narcotics trafficking and related violence.  John Woudenberg, a Special Agent with the FBI, said that the possibility of a New York supply connection for the crack was particularly significant.

On March 21, 1997, a federal magistrate issued complaints charging defendants Charles, Mason, and Ahart with conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846 (Count 1); charging Charles and Ahart with possession of cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (Count 2); and charging Ahart with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count 3). A grand jury indictment followed on April 24, 1997. The Commonwealth terminated its prosecution by filing a Notice of Nolle Prosequi.

**B.    Appellants' Motions for Suppression of the Evidence and Dismissal of the Indictment**

Proceeding before the federal district court, Charles and Ahart filed motions to dismiss the indictment based on the doctrines of abstention, collateral estoppel, and prosecutorial vindictiveness; to suppress the wiretapped conversations and all evidence derived therefrom, pursuant to federal and state wiretap law and the Fourth Amendment to the United States Constitution; and to suppress all physical evidence, on the ground that the relevant search warrants were invalid. After a three-day evidentiary hearing held on September 2, 4, and 8, 1997, the district court granted defendants' motion to suppress the Charles-Kelley phone conversation on grounds that it was protected by the attorney-client privilege and subject to a minimization order, but denied the motion to suppress with respect to all other evidence

-15-

derived from the wiretapped conversations.  See Charles, 1998 WL 204696, at *22.  As a corollary to this ruling, the court denied the motion to dismiss.  See id.

In reaching this determination, the district court specifically found that Petrino's interception of the Charles-Kelley phone call was inadvertent and unintentional, albeit negligent.  See id. at 4.  The court also found that overall the state law enforcement officials managed the implementation of the minimization order in good faith and in an objectively reasonable manner.  See id.

## DISCUSSION

### I.  Standard of Review

In this Circuit, appellate review of a suppression motion is bifurcated.  "In reviewing a denial of a suppression motion, the district court's ultimate legal conclusion, including the determination that a given set of facts constituted probable cause, is a question of law subject to de novo review."  E.g., United States v. Khounsavanh, 113 F.3d 279, 282 (1st Cir. 1997).  The trial court's findings of facts, in contrast, must be upheld unless they are clearly erroneous.  See, e.g., id.; United States v. Young, 105 F.3d 1, 5 (1st Cir. 1997).  "A clear error exists only if, after considering all of the evidence, we are left with a definite and firm conviction that a mistake has been made."  United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996).  This deference to the district court's findings of facts "reflects our

-16-

awareness that the trial judge, who hears the testimony, observes the witnesses' demeanor and evaluates the facts first hand, sits in the best position to determine what actually happened." Young, 105 F.3d at 5. As a corollary, "we will uphold a district court's decision to deny a suppression motion provided that any reasonable view of the evidence supports the decision." McCarthy, 77 F.3d at 529.

## II. **Motion to Suppress the Wiretap Evidence**

Appellants raise two arguments in support of their motion to suppress the wiretapped conversations and the evidence arising therefrom: (1) the evidence gleaned from the wiretap of the 21 Field Street phone line is not admissible pursuant to the Federal Wiretap Statute, 18 U.S.C. §§ 2510 et seq., and (2) the state court's suppression ruling collaterally estops the government from using the wiretap evidence. Neither argument prevails. Instead, we hold that the district court's limited suppression of the Charles/Kelley phone call was an appropriate remedy for the state police's violation of the amended minimization order.

### A. **18 U.S.C. § 2516(2)**

In support of their argument for suppression appellants cite 18 U.S.C. § 2516(2), which provides authority for receipt in federal court of state authorized wiretaps. The statute provides, in relevant part:

The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire, oral, or electronic communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire, oral, or electronic communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made . . . .

18 U.S.C. § 2516(2). According to appellants, § 2516(2) requires federal courts to defer to state law in circumstances where, as here, the federal prosecution attempts to make use of wiretap evidence obtained through use of a state court warrant. If state law applies, appellants reason, the district court was required to suppress the evidence arising out of the 21 Field Street wiretap because the state court had done so in the prior state proceeding. Appellants misconstrue the statute.

The district court correctly ruled that federal law governs the admissibility of evidence in federal prosecutions. See, e.g., United States v. Wilson, 36 F.3d 205, 208 (1st Cir. 1994); United States v. Mitro, 880 F.2d 1480, 1485 n.7 (1st Cir. 1989). As a result, "[e]vidence obtained in violation of neither the Constitution nor federal law is admissible in federal court proceedings without regard

-18-

to state law." United States v. Sutherland, 929 F.2d 765, 769 (1st Cir. 1991) (quoting United States v. Little, 753 F.2d 1420, 1434 (9th Cir. 1984)).  This is true even when the evidence "is obtained pursuant to a state search warrant or in the course of a state investigation." Mitro, 880 F.2d at 1485 n.7.  Considering a question closely related to the one we face today, the Supreme Court has squarely affirmed this principle:

> In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out.  The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.

Elkins v. United States, 364 U.S. 206, 223-24 (1960).

Against this background, we turn to three decisions that are directly on point and foreclose appellants' argument.  In United States v. Miller, 116 F.3d 641, 662-64 (2d Cir. 1997), the defendants relied on a prior state court suppression order to argue that the district court improperly denied their motion to suppress all evidence gleaned from a state-court-authorized wiretap.  The Second Circuit rejected the argument, stating:

> [T]he state court's suppression order did not foreclose consideration of the wiretap evidence by the grand jury, and it was not binding on the district court.  The latter court properly held

-19-

> an evidentiary hearing on defendants' suppression
> motion and considered the motion on its merits.

Id. at 663.  The Miller Court reasoned that "'state court rulings in a criminal trial are not binding on a federal court'" because "'state and national sovereignty are separate and distinct from one another.'" Id. (quoting United States v. Miller, 14 F.3d 761, 763 (2d Cir. 1994)).

An identical result was reached in United States v. Williams, 124 F.3d 411, 426-28 (3d Cir. 1997).  In Williams, the Third Circuit rejected the argument that § 2516(2) required the district court to suppress state wiretap evidence where communications intercepted pursuant to a state statute were subsequently disclosed to federal authorities in violation of state law.  See id. at 426.  Instead, the court applied federal law and held that it did not require suppression. See id. at 427-28.

Finally, in United States v. Padilla-Peña, 129 F.3d 457, 464 (8th Cir. 1997), the defendants unsuccessfully argued that state wiretap evidence was inadmissible in a federal trial because the wiretap minimization procedures applied by the local police violated state law.  The court concluded that the state officers had complied with 18 U.S.C. § 2518(5) and emphasized that "evidence obtained in violation of a state law is admissible in a federal criminal trial if the evidence was obtained without violating the Constitution or federal law."  Id.

Miller, Williams, and Padilla-Peña foreclose appellants' argument that § 2516(2) requires a federal court to apply state law in determining the admissibility of state wiretap evidence. While we need look no further, we find additional support for our conclusion in United States v. Sutherland, 929 F.2d 765 (1st Cir. 1991), a decision that does not directly address the reach of § 2516(2).

In Sutherland, state law enforcement personnel utilized an informant to procure incriminating tape recordings without a warrant. See id. at 769. Under Massachusetts law, warrantless interception of oral and wire communications is prohibited absent consent of all the parties, except in two circumstances which did not apply to the case. See Mass. Gen. Laws ch. 272, § 99. The Commonwealth conceded that the tape recordings had been obtained in violation of state law and consequently that testimony derived therefrom could not be used as substantive evidence in a Massachusetts prosecution. The Commonwealth, however, moved in limine for a determination that it would be allowed to use the tapes as impeachment evidence. The question was presented to the Supreme Judicial Court, which held that the recorded conversations were not admissible for any purpose. See Sutherland, 929 F.2d at 769 (citing Commonwealth v. Fini, 531 N.E.2d 570, 574 (Mass. 1988)). As a result of this ruling, the Commonwealth dismissed the case.

A federal indictment followed. Prior to trial, the defendants moved to suppress on the ground that the tape recordings were obtained by state law enforcement personnel in violation of the Massachusetts wiretap law. The district court denied the motion and this Court affirmed, stating "we hold that in federal criminal prosecutions, the admissibility of wiretap evidence is a question of federal law." Id. at 771. Today, we reaffirm the holding of Sutherland and apply it with equal force to this case.

In so doing, we once again leave open the possibility that "in an extreme case of flagrant abuse of the law by state officials, where federal officials seek to capitalize on that abuse, this court might choose to exercise its supervisory powers by excluding ill-gotten evidence." Id. at 770. Here, however, the district court found that "overall, the state law enforcement officials managed the implementation of the minimization order in good faith and in an objectively reasonable manner." Charles, 1998 WL 204696, at *4. This determination is not clearly erroneous; to the contrary, it is amply supported by the record and therefore we decline to overturn it. See Khounsavanh, 113 F.3d at 282.

Finally, in rejecting appellants' § 2516(2) argument, we recognize that several courts have concluded that § 2516(2) may require the application of state law where the state wiretap statute contains standards that are more protective of privacy than the corresponding

-22-

provisions of the Federal Wiretap Statute.  See, e.g., United States v. McNulty, 729 F.2d 1243, 1264 (10th Cir. 1983) (en banc); Unites States v. Marion, 535 F.2d 697, 702 (2d Cir. 1976).  In Marion, for example, the court stated:

> [W]hether the proceedings be federal or state, interpretation of a state wiretap statute can never be controlling where it might impose requirements less stringent than the controlling standard of Title III.  If a state should set forth procedures more exacting than those of the federal statute, however, the validity of the interceptions and the orders of authorization by which they were made would have to comply with that test as well.

Marion, 535 F.2d at 702 (footnote omitted).  This rule of law, however, is not applicable to this case.  As the district court stated, "[b]ecause the state court's suppression order in this case was not based upon the application of more stringent standards governing authorization procedures for wiretap orders under Massachusetts law, this line of cases is inapposite to defendants' claim, which hinges on the appropriate remedy for violation of a minimization order." Charles, 1998 WL 204696, at *10 (footnote omitted).

In other words, appellants' reliance on the Marion line of cases is misplaced.  The Massachusetts wiretap statute does not contain a higher standard for assessing minimization violations.  To the contrary, the state statute does not contain any express minimization provisions.  Instead, Massachusetts courts consult federal law in

-23-

ruling on violations of minimization orders. See, e.g., Commonwealth v. Vitello, 327 N.E.2d 819, 842 n.22 (Mass. 1975); Commonwealth v. Wallace, 493 N.E.2d 216, 221 n.10 (Mass. App. Ct. 1986). This case is no exception: the state court expressly relied on federal case law in determining the appropriate remedy for the violation of the minimization order. See Commonwealth v. Charles, slip op. at 7 ("Since there appears to be no Massachusetts case directly on point, this court must be guided by federal law.").

As indicated, "in federal criminal prosecutions, the admissibility of wiretap evidence is a question of federal law." Sutherland, 929 F.2d at 771. It follows that § 2516(2) does not require a federal court to defer to a state court's application of federal standards for a violation of a minimization order.

## B. **Collateral Estoppel**

Appellants next allege that the state court suppression ruling should collaterally estop the federal government from using the wiretap evidence. This argument was not presented to the district court. Instead, appellants took the position before the lower court that collateral estoppel should bar the entire prosecution. Appellants apparently now recognize, as the district correctly observed in its astute opinion, that even if collateral estoppel applied, it nevertheless would not operate to require dismissal of the indictment. See Charles, 1998 WL 204696, at *6. Because appellants failed to

-24-

present this argument to the district court, it is waived. See, e.g., United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992) ("[A] party is not at liberty to articulate specific arguments for the first time on appeal simply because the general issue was before the district court.").

Moreover, even if appellants' collateral estoppel argument were properly before this Court, we see no merit in it. "In this circuit it is well established that a ruling in a state prosecution will collaterally estop the federal government only if federal authorities substantially controlled the state action or were virtually represented by the state court prosecutor." Sutherland, 929 F.2d at 771; see also United States v. Land at 5 Bell Rock Road, Freetown, Mass., 896 F.2d 605, 610 (1st Cir. 1990); United States v. Bonilla Romero, 836 F.2d 39, 43 (1st Cir. 1987). The record in this case conclusively shows that the federal government was not a party to any aspect of the state investigation or the state court proceedings. Appellants concede as much, but point out that the state prosecutor, Assistant District Attorney Geline W. Williams, was appointed Special Assistant United States Attorney in order to assist in the subsequent federal prosecution. This argument has been considered and rejected by at least two other circuits. See United States v. Perchitti, 955 F.2d 674, 677 (11th Cir. 1992); United States v. Safari, 849 F.2d 891, 893 (4th Cir. 1988). We join these circuits in holding that the

-25-

appointment of a state prosecutor as a special federal prosecutor, subsequent to the state court action, "does not retroactively make the federal government a party to an earlier state court proceeding." Safari, 849 F.2d at 893. Consequently, appellants' collateral estoppel argument fails.

### C. Limited Suppression

In the alternative, appellants argue that the district court's remedy for the violation of the amended minimization order was inadequate. We reject this argument.

The district court ruled that the interception of the July 29 Charles/Kelley phone call was in clear violation of the amended minimization order, entitling appellant Charles to a suppression remedy under § 2518(1)(a)(iii). See Charles, 1998 WL 204696, at *12. The district court, however, declined to invalidate the entire wiretap. Instead, the court ruled that the appropriate remedy was the limited suppression of the Charles/Kelley call because the totality of the circumstances demonstrates that the state police's minimization efforts were reasonably managed. See id. at 13-14. The district court's ruling is amply supported by both the law and the record.

The Federal Wiretap Statute requires the government to conduct electronic surveillance "in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). In Scott v. United States, 436 U.S. 128, 137-39

(1978), the Supreme Court adopted a standard of "objective reasonableness" for assessing minimization violations. Under Scott, the critical inquiry is whether the minimization effort was managed reasonably in light of the totality of the circumstances. See United States v. Hoffman, 832 F.2d 554, 557 (1st Cir. 1989); see also United States v. Uribe, 890 F.2d 554, 557 (1st Cir. 1989) ("The touchstone in assessing minimization is the objective reasonableness of the interceptor's conduct."). In making this determination, we are mindful that the reasonableness of the monitor's conduct must be viewed "in the context of the entire wiretap as opposed to a chat-by-chat analysis." Hoffman, 832 F.2d at 1308. Equally important, "[t]he government is held to a standard of honest effort; perfection is usually not attainable, and is certainly not legally required." Uribe, 890 F.2d at 557. Although compliance determinations are necessarily fact-specific, three factors are often crucial in measuring the reasonableness of the government's conduct: (1) the nature and complexity of the suspected crimes, (2) the thoroughness of the government precautions to bring about minimization, and (3) the degree of judicial supervision over the surveillance practices. See United States v. London, 66 F.3d 1227, 1236 (1st Cir. 1995); Uribe, 890 F.2d at 557; United States v. Angiulo, 847 F.2d 956, 979 (1st Cir. 1988). Finally, we note that where an investigation involves a drug ring of unknown proportion, as in this

case, "the need to allow latitude to eavesdroppers is close to its zenith."  Hoffman, 832 F.2d at 1308.

Our opinion in Hoffman, which involved a minimization violation far more significant than the one in this case, is instructive.  In Hoffman, federal agents monitoring a wiretap in a narcotics investigation intercepted 22 calls between a suspect's wife and her attorney.  The defendants moved to suppress the entire wiretap on the ground that the agents had flagrantly disregarded both federal law, see 18 U.S.C. § 2518(5), and the district court's minimization order.  The district court denied the motion, electing instead to suppress only the offending calls.  This Court affirmed on the basis that "[t]he minimization effort, assayed in light of the totality of the circumstances, was managed reasonably."  Hoffman, 832 F.2d at 1307-08.  In reaching this conclusion, the Hoffman Court rejected the "suggestion that total suppression must be ordered to forestall future misconduct," but left open the possibility that "in a particularly horrendous case, total suppression may be . . . an 'appropriate' remedy."  Id. at 1309.

Here, the record is replete with evidence supporting the district court's findings that the state police managed the wiretap in an objectively reasonable manner, took due precautions not to overreach, and minimized non-pertinent calls as soon as practicable.

-28-

Accordingly, we pause only briefly to highlight some of the more salient facts.

As in Hoffman, this was a lengthy and complex investigation involving a significant number of drug traffickers engaged in interstate narcotics activity. During the seven days that the wiretap was active, the state police intercepted over 800 telephone calls, most of which involved drug activity. They minimized 62 calls, including four calls involving attorneys. The inadvertent interception of the July 29 Charles/Kelly call was the only minimization error that occurred; notably, the monitors correctly minimized all other calls involving attorneys. In addition, the state police terminated the wiretap after achieving their objective and did not rely on any information gleaned from the Charles/Kelley call during any aspect of the investigation. Equally important, judicial supervision over the wiretap was pervasive. First, the wiretap application was supported by a detailed, fifty-page affidavit of Trooper Thomas. Second, the Superior Court carefully reviewed the application and issued an amended minimization order three days after issuing the initial order. Third, the court order was limited to a single telephone for a period of 15 days.

As indicated, given this record we see no error in the district court's determination that "the electronic surveillance was managed reasonably." Charles, 1998 WL 204696, at *15 (internal

quotation marks and citation omitted).  Accordingly, "there was no taint upon the investigation as a whole sufficient to warrant the sweeping relief which [the appellants] urge[]."  Hoffman, 832 F.2d at 1307.  To the contrary, the district court correctly limited suppression to the July 29 Charles/Kelley phone call only.  See id.

## III.  **Abstention**

In yet another iteration of their argument that the state court decision should have precluded the government from using the wiretap evidence, appellants invoke the abstention doctrine.  This argument misses the mark, and we need not discuss it in depth.

There are several well-known doctrines of abstention.  See Bath Mem'l Hosp. v. Maine Health Care Fin. Comm'n, 853 F.2d 1007, 1012-13 (1st Cir. 1988) (discussing the various abstention doctrines); see also 17A Charles Alan Wright et al., Federal Practice and Procedure § 4241 (1998) (same).  In this case, however, appellants do not cite a specific theory of abstention.  Instead, appellants quote the following passage in support of their contention that the district court should have dismissed the indictment:  "A federal court, by abstaining, may avoid having to decide a uniquely difficult question of state law of great local impact and uniquely important local concern."  Bath, 853 F.2d at 1012 (citing Louisiana Power & Light Co. v. Thibodaux, 360 U.S. 25 (1959)).  As we have already indicated, the district court properly ruled that "federal law governs the admissibility of evidence in

-30-

federal proceedings, regardless of whether that evidence may have been obtained in violation of state law." <u>Charles</u>, 1998 WL 204696, at *6 (citing <u>Sutherland</u>, 929 F.2d at 769).  Consequently, contrary to appellants' assertion, the district court simply did not "decide a uniquely difficult question of state law."  <u>Bath</u>, 853 F.2d at 1012.

Moreover, it is equally clear that none of the recognized doctrines of abstention apply in this case.  First, <u>Pullman</u> abstention is inapplicable because this case did not involve a federal constitutional issue that would be mooted or placed in a different posture upon construction of a state law.  <u>See</u> <u>Pullman Comm'n of Texas</u> v. <u>Pullman Co.</u>, 312 U.S. 496, 501 (1941).  Second, the <u>Burford</u> doctrine does not apply, as there is no complex state regulatory scheme.  <u>See</u> <u>Burford</u> v. <u>Sun Oil Co.</u>, 319 U.S. 315, 333-34 (1943).  Finally, because ongoing state court proceedings are a necessary prerequisite to both <u>Younger</u> abstention and <u>Colorado River</u> principles, these doctrines are likewise inapplicable.  <u>See</u> <u>Colorado River Water Conservation Dist.</u> v. <u>United States</u>, 424 U.S. 800, 881 (1976); <u>Younger</u> v. <u>Harris</u>, 401 U.S. 37, 40 (1971).  In short, appellants have failed to raise a colorable argument in support of federal abstention.

## IV.  <u>Franks Violation</u>

Appellants allege that the evidence seized at Allen Street must be suppressed because the state police intentionally omitted material information from the warrant affidavit in order to mislead the

magistrate judge. Appellants cite Franks v. Delaware, 438 U.S. 154, 171-72 (1978), in support of this argument.

In Franks, the Supreme Court held that a defendant was entitled to a hearing at which he could challenge the truthfulness of statements made in an affidavit supporting a search warrant if the defendant made a substantial showing that (1) a statement in the affidavit was knowingly and intentionally false, or made with reckless disregard for the truth, and (2) the falsehood was necessary to the finding of probable cause. See id. In this Circuit, material omissions by an affiant are sufficient to constitute the basis for a Franks hearing. See United States v. Parcels of Land, 903 F.2d 36, 46 (1st Cir. 1990); United States v. Rumney, 867 F.2d 714, 720 (1st Cir. 1989). However, a district court's determination that the requisite showing has not been made will be overturned only if clearly erroneous. See Parcels of Land, 903 F.2d at 46; Rumney, 867 F.2d at 720; United States v. Southard, 700 F.2d 1, 10 (1st Cir. 1983).

Here, appellants allege that Trooper Thomas's failure to include information pertaining to the violation of the amended minimization order was a material omission in the affidavit for the Allen Street search warrant. We disagree. The district court correctly ruled that interception of the Charles/Kelly telephone call did not invalidate the entire wiretap and warranted only suppression of that one call. Further, Thomas did not include any information from

-32-

the Charles/Kelley call in the affidavit.  The magistrate judge, therefore, did not rely on any evidence that was obtained due to the state police's failure to comply with the minimization order. Consequently, we conclude that the omission was immaterial to the validity of the search warrant.  This conclusion is fatal to appellants' argument.

## V. The District Court's Ruling that the Narcotic Involved in this Case Constitutes Crack Cocaine

Appellants argue that the cocaine base involved in this case is not crack cocaine for the purposes of the sentencing guidelines. See U.S.S.G. § 2D1.1(c).  In support of this argument, appellants cite the low purity of the cocaine and complain that the government produced no evidence regarding the melting point or water solubility of the seized narcotic.  In the First Circuit, whether contraband is crack is a question of fact which, once found, is reviewed only for clear error. See United States v. Robinson, 144 F.3d 104, 109 (1st Cir. 1998). We see no error in this case.

First, appellants' allegations regarding water solubility and melting point have been squarely rejected by this Circuit.  See United States v. Ferreras, 192 F.3d 5, 11 (1st Cir. 1999); United States v. Martínez, 144 F.3d 189, 190 (1st Cir. 1998); Robinson, 144 F.3d at 109. In Martínez, for example, we stated:

> [O]nce the government laid a proper foundation
> "by introducing a chemical analysis . . . proving

that, chemically, the contraband was cocaine base," no further scientific evidence was needed. Instead, the government could bridge the evidentiary gap between cocaine base and crack cocaine by presenting lay opinion evidence (or an opinion proffered by an expert who possessed practical as opposed to academic credentials) from "a reliable witness who possesses specialized knowledge" (gained, say, by experience in dealing with crack or familiarity with its appearance and texture).

144 F.3d at 190 (quoting Robinson, 144 F.3d at 108-09) (alteration in original). In this case, the government produced competent scientific evidence from two chemists to prove that the 221 grams of contraband seized at the time of appellants' arrest was cocaine base. Once the government introduced this testimony, no additional scientific evidence was needed. From that point forward, competent lay testimony, such as that of Trooper Thomas, remarking on the substance's distinctive appearance and texture and identifying it as crack, completed the necessary link in the evidentiary chain. See Ferreras, 192 F.3d at 11; Martínez, 144 F.3d at 190; Robinson, 144 F.3d at 109.

Appellants' drug purity argument is also contrary to well established law. In Chapman v. United States, 500 U.S. 453 (1991), the Supreme Court held that unless otherwise specified, the purity of a controlled substance is not a factor in sentencing under 21 U.S.C. § 841(b). See id. at 459-68. The Court explained: "Congress adopted a 'market-oriented' approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of

pure drug involved, is used to determine the length of the sentence."

Id. at 461.   The Court further explained:

> Congress clearly intended the dilutant, cutting
> agent, or carrier medium to be included in the
> weight of [cocaine] for sentencing purposes.
> Inactive ingredients are combined with pure
> heroin or cocaine, and the mixture is then sold
> to consumers as a heavily diluted form of the
> drug.  In some cases, the concentration of the
> drug in the mixture is very low. . . .
>
> By measuring the quantity of the drugs according
> to the "street weight" of the drugs in the
> diluted form in which they are sold, rather than
> according to the net weight of the active
> component, the statute [21 U.S.C. § 841] and the
> Sentencing Guidelines increase the penalty for
> persons who possess large quantities of drugs,
> regardless of their purity.  That is a rational
> sentencing scheme.

Id. at 460, 465.  As the Chapman Court indicated, the Sentencing

Guidelines explicitly adopt this approach:

> Unless otherwise specified, the weight of a
> controlled substance set forth in the table
> refers to the entire weight of any mixture or
> substance containing a detectable amount of the
> controlled substance.  If a mixture or substance
> contains more than one controlled substance, the
> weight of the entire mixture or substance is
> assigned to the controlled substance that results
> in the greater offense level.

U.S.S.G. § 2D1.1(c) note A.  Consequently, we conclude that the

district court properly based appellants' sentence on the total weight

of the narcotic without regard to the purity of the cocaine base.  See

Chapman, 500 U.S. at 460-65; U.S.S.G. § 2D1.1(c); see also United States v. Cartwright, 6 F.3d 294, 303 (5th Cir. 1993).

## CONCLUSION

For the reasons stated above, we **AFFIRM** appellants' convictions and the corresponding sentences imposed by the district court.