# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 01-1426

———————

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff-Appellee, | * |
| | *   Appeal from the United States |
| v. | *   District Court for the |
| | *   District of Minnesota. |
| Eusebio Lopez-Arce, also known as | * |
| Eduardo De Jesus Orzuna, also known | * |
| as Eusebio Lopez-Perez, | * |
| | * |
| Defendant-Appellant. | * |

———————

Submitted:  August 20, 2001

Filed: October 3, 2001

———————

Before BYE, LAY, and JOHN R. GIBSON, Circuit Judges.

———————

LAY, Circuit Judge.

Eusebio Lopez-Arce[1] was convicted of one count of conspiracy to distribute cocaine and methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1); one count of distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; one count of possession with intent to distribute methamphetamine,

———————

[1]Eusebio Lopez-Arce was originally charged and tried under the name Eusebio Lopez-Perez.

in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). The district court[2] sentenced Lopez-Arce to 235 months imprisonment and five years supervised release. On appeal, Lopez-Arce contends (1) the district court erred in admitting evidence seized during the arrest of an unindicted co-conspirator who was tried in a separate proceeding because the Government failed to prove the existence of the overall conspiracy, (2) this resulted in a variance between the conspiracy charged and the proof offered at trial which substantially affected his rights, and (3) the district court erred in calculating his criminal history score and in denying his request for a minimal role reduction. We affirm.

## I. Facts

This appeal arises from seven undercover drug purchases from Jose Belen Payan-Valencia beginning in August of 1999 and culminating in a "buy bust" on January 20, 2000. The first five purchases involved cocaine, while the final two purchases involved methamphetamine. Payan-Valencia was followed to the apartment of Eusebio Lopez-Arce prior to one of the cocaine purchases, and prior to both methamphetamine purchases. Jose Belen Payan-Valencia, Analberto Lopez-Arce,[3] and Eusebio Lopez-Arce were subsequently charged (along with others known and unknown) with conspiracy to distribute cocaine and methamphetamine. Payan-Valencia and Analberto Lopez-Arce pled guilty to the charges filed against them.

Between August 10, 1999 and January 20, 2000, Payan-Valencia made sales

---

[2]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

[3]Analberto Lopez-Arce is the younger brother of the defendant.

of cocaine and methamphetamine to an undercover officer, Deputy Craig Martin, of the Hennepin County Sheriff's Office. During that period, law enforcement officers were attempting to identify the source of the drugs. Each time that Deputy Martin would place an order for cocaine or methamphetamine other officers would follow Payan-Valencia to determine where he was obtaining the illegal drugs.

On August 10, 1999, after Deputy Martin had ordered two ounces of cocaine from Payan-Valencia, surveillance officers followed Payan-Valencia to an apartment at 280 West Winifred in Saint Paul, Minnesota. Eusebio Lopez-Arce lived at 280 West Winifred, Apartment Four. Payan-Valencia was then observed leaving 280 West Winifred, returning to his own apartment in Bloomington, Minnesota, and subsequently making the sale to Deputy Martin.

On August 17, 1999, prior to the second transaction, surveillance officers followed Payan-Valencia to 1377 Edgerton Street in Saint Paul. This was the address of Analberto Lopez-Arce. When Payan-Valencia left the Edgerton residence, he was with another Hispanic male who left in a green Crown Victoria, a vehicle driven by Isidro Pacheco-Sanchez. The Crown Victoria was followed to 280 West Winifred. Payan-Valencia was then followed to the location where he again sold Deputy Martin two ounces of cocaine.

On August 25, 1999, prior to the third transaction between Payan-Valencia and Deputy Martin, surveillance officers again followed Payan-Valencia to 1377 Edgerton Street in Saint Paul. Just prior to Payan-Valencia's arrival, a blue Nissan Sentra registered under an alias used by Eusebio Lopez-Arce arrived, having been followed from his residence at 280 West Winifred. After approximately forty minutes, Payan-Valencia left Analberto Lopez-Arce's residence, returned to his own apartment, and then met with Deputy Martin and sold him four ounces of cocaine. It was during this exchange that Deputy Martin first discussed possible future

transactions involving methamphetamine with Payan-Valencia.

On September 8, 1999, Deputy Martin purchased six ounces of cocaine from Payan-Valencia. Again, Payan-Valencia was followed by surveillance officers to Analberto Lopez-Arce's Edgerton Street residence prior to the sale. The final cocaine deal took place on September 21, 1999. Deputy Martin again purchased six ounces of cocaine from Payan-Valencia.

During the September 21 meeting between Payan-Valencia and Deputy Martin, Payan-Valencia explained that there might be some problems getting the methamphetamine as they had discussed previously because "another boy who gets [methamphetamine] from my friend" had been arrested a few days earlier. Payan-Valencia told Deputy Martin that the individual to whom he referred had been caught "on the street" with "twenty-five ounces or something."

Five days earlier, in Saint Paul, Isidro Pacheco-Sanchez had been arrested after an investigation by the Ramsey County Sheriff's Office. After an informant had ordered methamphetamine, a surveillance officer followed Pacheco-Sanchez to Eusebio Lopez-Arce's residence at 280 West Winifred. He entered the apartment building without a coat, and returned to his car ten minutes later wearing a coat and apparently trying to hide something underneath. Pacheco-Sanchez was stopped shortly after leaving the building at 280 West Winifred and approximately twenty ounces of methamphetamine were seized from the green Crown Victoria he was driving.

The next transaction between Payan-Valencia and Deputy Martin did not occur until January 2000. Although they had some discussions, Payan-Valencia said that he was not able to locate his source. On January 18, 2000, prior to the sale of one-half pound of methamphetamine, surveillance officers followed Payan-Valencia to

Eusebio Lopez-Arce's residence at 280 West Winifred. At the sale, Deputy Martin payed Payan-Valencia with $5500 in photocopied buy money. After the sale was completed, surveillance officers followed Payan-Valencia back to Eusebio Lopez-Arce's residence at 280 West Winifred. Payan-Valencia waited until Eusebio arrived, went inside, left a few minutes later, and returned to his apartment in Bloomington.

Prior to the final sale on January 20, 2000, which was for one and one-half pounds of methamphetamine, surveillance officers followed Payan-Valencia to Eusebio Lopez-Arce's residence at 280 West Winifred. Payan-Valencia went inside and shortly thereafter Analberto Lopez-Arce arrived and went inside. Payan-Valencia and Analberto Lopez-Arce left Eusebio Lopez-Arce's residence together. Analberto then drove to an apartment complex in Saint Paul, entered, and then left and drove back to meet Payan-Valencia in a parking lot. Payan-Valencia subsequently went to meet with Deputy Martin. Payan-Valencia entered Deputy Martin's vehicle and showed him the methamphetamine. Deputy Martin then gave the arrest signal and Payan-Valencia was placed under arrest.

At approximately the same time, Eusebio and Analberto Lopez-Arce were arrested together at a gas station in Saint Paul after leaving Eusebio Lopez-Arce's residence. A search of Eusebio Lopez-Arce incident to his arrest found that $180 of the $482 he had in his wallet matched the photocopied buy money from the methamphetamine transaction that had taken place on January 18, 2000. Analberto Lopez-Arce had no money matching the buy money.

Later that day, a search warrant was executed at Eusebio Lopez-Arce's residence at 280 West Winifred, Apartment Four, Saint Paul, Minnesota. In the master bedroom, two individually-wrapped, one-ounce packages of cocaine were found in a baby's crib. In the same bedroom, several envelopes containing $9000 in cash were discovered. Of that total, $1980 matched the photocopied buy money

given to Payan-Valencia in exchange for the one-half pound of methamphetamine two days earlier.

Eusebio Lopez-Arce, Analberto Lopez-Arce, and Jose Belen Payan-Valencia were subsequently charged in a nine-count indictment. Eusebio Lopez-Arce was charged with four counts: (1) conspiracy, (2) distribution of methamphetamine, (3) possession with intent to distribute methamphetamine, and (4) possession with intent to distribute cocaine. Analberto Lopez-Arce and Jose Belen Payan-Valencia pled guilty to the charges brought against them. On June 29, 2000, after a three day trial, a jury found Eusebio Lopez-Arce guilty on all four counts. He was sentenced on February 7, 2001. His total offense level was thirty-four and his criminal history category was V. Accordingly, he was sentenced to 235 months imprisonment, the lowest period available within the guideline sentencing range.

## II. Discussion

A. <u>Introduction of the Evidence Obtained in the Arrest of Isidro Pacheco-Sanchez</u>

Defendant first argues that the district court erred by admitting into evidence the approximately twenty ounces of methamphetamine seized in connection with the September 16, 1999, arrest of Isidro Pacheco-Sanchez. Eusebio Lopez-Arce contends that the Government did not prove that Pacheco-Sanchez was part of the overall conspiracy alleged in count one of the indictment, and therefore the evidence was inadmissible at trial. The Government counters that the district court did not abuse its discretion in admitting the evidence because it would be admissible either as part of the overall conspiracy charged, or alternatively under Federal Rule of Evidence 404(b). We review such evidentiary rulings for abuse of discretion. <u>United States v. Forcelle</u>, 86 F.3d 838, 841 (8th Cir. 1996).

The essence of the crime of conspiracy is the "agreement to commit an unlawful act." Iannelli v. United States, 420 U.S 770, 777 (1975). "The agreement need not be shown to have been explicit. It can instead be inferred from the facts and circumstances of the case." Id. at 777 n.10. Furthermore, whether the evidence proves there was a single conspiracy or a number of separate conspiracies is a question of fact for the jury to decide. United States v. Morales, 113 F.3d 116, 118 (8th Cir. 1997); United States v. Jenkins, 78 F.3d 1283, 1288 (8th Cir. 1996). In light of the record before us, we hold that the district court did not err in admitting the evidence obtained during the arrest of Pacheco-Sanchez.

The evidence adduced at trial connects Pacheco-Sanchez with all three of the indicted co-conspirators. On August 17, 1999, Pacheco-Sanchez exited Analberto Lopez-Arce's residence with Payan-Valencia and was followed to Eusebio Lopez-Arce's apartment building. On September 16, 1999, the day of Pacheco-Sanchez's arrest, he was followed to Eusebio Lopez-Arce's apartment, entered without a coat, and left wearing a coat under which it appeared that he was hiding something. Soon after, he was arrested with twenty ounces of methamphetamine. Additionally, it is reasonable to infer that on September 21, 1999, Payan-Valencia referred to the arrest of Pacheco-Sanchez. During that conversation Payan-Valencia further connected Pacheco-Sanchez with Payan-Valencia's source: Payan-Valencia told Deputy Martin the person who had recently been arrested was "another boy who gets [methamphetamine] from my friend."

Given these facts and their reasonable inferences, we hold that the district court did not abuse its discretion in allowing the methamphetamine associated with the September 16, 1999, arrest of Pacheco-Sanchez to be admitted into evidence as part of the overall conspiracy. The record tends to connect Pacheco-Sanchez to all three of the indicted co-conspirators and provides sufficient grounds for the admission of evidence as part of the conspiracy as a whole.

B.  Variance Between Alleged Conspiracy and Proof Offered at Trial

Eusebio Lopez-Arce next argues that the Government failed to prove the single conspiracy alleged in the indictment, but instead proved a number of conspiracies, resulting in a variance that substantially affected (i.e., prejudiced) his rights.  We disagree.  Not only do we hold the jury could have reasonably found the single conspiracy charged based upon the proof offered at trial, but it is difficult to see how the defendant was prejudiced given that he was the sole defendant on trial and was arguably implicated in any other conspiracy the evidence could prove.

"In order to prevail . . . based on a fatal variance between the single conspiracy charged and the proof offered at trial," Eusebio Lopez-Arce "must establish that a variance exits, and that the variance affected his substantial rights."  United States v. Rabins, 63 F.3d 721, 724 (8th Cir. 1995).  "We reverse on such a claim if the evidence does not support the single conspiracy and the defendant was prejudiced by the variance between the indictment and the proof."  United States v. Pullman, 187 F.3d 816, 821 (8th Cir. 1999).  In making such a determination, we look to the totality of the circumstances, giving the verdict the benefit of the evidence and all reasonable inferences that arise therefrom.  Id.; Rabins, 63 F.3d at 724.

In order to find that a single conspiracy exists, "it is not necessary to show that all the conspirators were involved in each transaction or that all the conspirators even knew each other."  United States v. Rosnow, 977 F.2d 399, 405 (8th Cir. 1992) (per curiam).

> "A defendant's participation in a conspiracy is proven by evidence tending to show that the defendant shared a common purpose or design with his alleged coconspirators. . . . Thus, if the activities of a defendant . . . facilitated the endeavors of other alleged coconspirators or

facilitated the venture as a whole," the necessary interdependence of the alleged conspirators' acts–reflecting the conspirators' coincidence of interests and a knowing coordination of efforts to produce a result in harmony with those interests–is present.

United States v. McCoy, 86 F.3d 139, 141 (8th Cir. 1996) (quoting and citing United States v. Horn, 946 F.2d 738, 740-41 (10th Cir. 1991)). In evaluating the evidence, we consider factors such as "the nature of the activities, the location and time frame in which the activities were performed, and the participants involved." Morales, 113 F.3d at 119 (internal citations omitted) (finding two different conspiracies to distribute marijuana because the operations took place in two wholly separate locations, were separated by more than four months, and had but one common participant).

In the present case, a reasonable jury could find from the evidence offered at trial the existence of the single conspiracy charged. The evidence (viewed in the light most favorable to the verdict) tended to show the existence of a conspiracy with the common goal of selling cocaine and methamphetamine: the sales of cocaine and methamphetamine took place in one area (Saint Paul metropolitan area), were continuous for a period of six months, and all of the co-defendants charged were familiar with each other and with Isidro Pacheco-Sanchez. The evidence further demonstrated that the conspiracy revolved around the residences of Analberto and Eusebio Lopez-Arce. The Government's proof was sufficient to show the existence of a single conspiracy involving Eusebio Lopez-Arce and his two co-defendants, as well as Pacheco-Sanchez despite the fact that Pacheco-Sanchez was arrested in September 1999, and tried in separate proceedings. Therefore, no variance existed.

C. Sentencing

Eusebio Lopez-Arce argues that his criminal sentence was unlawful because

his "Criminal History was calculated without sufficient information and evidence as required by the Sentencing Guidelines." Thus, he concludes the "trial court breached its duty to exercise its discretion" by not imposing a sentence that "reflects the true impact of prior criminal history . . . ." Furthermore, he contends that the district court erred by not finding his role to be "minimal" or "minor" under the United States Sentencing Guidelines § 3B1.2(a) & (b). We find these claims to be without merit, and affirm the sentence imposed by the district court.[4]

After considering Eusebio Lopez-Arce's initial claim that his criminal history was improperly calculated, we are at a loss as to what additional information or evidence ought to have been evaluated. We review the application of Chapter Four of the United States Sentencing Guidelines to the facts for clear error. United States v. Jones, 87 F.3d 247, 248 (9th Cir. 1996), cert. denied, 519 U.S. 956 (1996). After reviewing the Presentence Report, we cannot say that the district court's sentence was clearly erroneous.

The Presentence Report appropriately computed Eusebio Lopez-Arce's criminal history: He received zero points for two offenses in California that occurred more than ten years prior to commencement of the instant offense. See U.S. Sentencing Guidelines Manual § 4A1.2(e)(2)-(3). He received one point each for driving without a license, driving with a suspended license, and presentation of a fraudulent identification card while in Pasadena, California. See id. §§ 4A1.1(c) & 4A1.2(c)(1). He received three points due to a 1991 conviction for possessing a

---

[4] Defendant's Offense Level was determined to be 34. Because his conviction related to different controlled substances, Sentencing Guideline § 2D1.1(c) is applied using marijuana equivalency. See U.S. Sentencing Guidelines Manual § 2D1.1(c) note 10. Given the quantities of cocaine and methamphetamine for which the defendant was found responsible–619.8 and 1463.5 grams respectively–we can find no error in this calculation.

narcotic and possessing a firearm in Los Angeles, California. See id. § 4A1.1(b). He received three points for a 1993 conviction for possessing narcotics for sale and sale of narcotics in Los Angeles, California, resulting in a sentence of three years in state prison. See id. § 4A1.1(a). Finally, he received one point based on a 1996 conviction for theft and giving false information to police after moving to Minnesota. See id. § 4A1.1(c). He received two additional points because he violated his parole, resulting in a violation warrant that was outstanding at the time of the instant offense. See id. § 4A1.1(d). This history results in a total of eleven criminal history points, which places Eusebio Lopez-Arce in Category V. See id. Ch. 5, Pt. A (Sentencing Table).

On appeal, the defendant reiterates the objections he made to the Presentence Report in the district court. We hold that the district court's overruling of these objections was not erroneous. Specifically, each sentence for which criminal history points were assigned was accurately calculated according to United States Sentencing Guidelines §§ 4A1.1 and 4A1.2 and arose from unrelated cases. See U.S. Sentencing Guidelines Manual § 4A1.2 note 3. Despite the fact that the sentence for driving without a license was imposed nearly five years after the offense was committed and presumably led to defendant's parole violation in July of 1995, the United States Sentencing Guidelines make it clear that it is a separate offense from the 1993 arrest for possession and sale of narcotics for which he was on parole. See id. ("Prior sentences are not considered related if they were for offenses that were separated by an intervening arrest."). Therefore, contrary to defendant's contentions, it is not sufficiently incorporated by the points assigned for the possession and sale of narcotics sentence. Furthermore, while it is true that *if* Eusebio Lopez-Arce had remained in California his parole for the 1993 conviction would have ended in November 1996, he absconded from parole and a violation warrant was subsequently issued. Thus, the allocation of two points under United States Sentencing Guideline § 4A1.1(d) was appropriate. See U.S. Sentencing Guideline Manual § 4A1.1(d) and note 4 ("A defendant who commits the instant offense while a violation warrant from

-11-

a prior sentence is outstanding . . . shall be deemed to be under a criminal justice sentence for the purposes of this provision if that sentence is otherwise countable, *even if that sentence would have expired absent such a warrant*.") (emphasis added).

Eusebio Lopez-Arce argues for a "departure from the applicable guideline range" and for "incremental movement downward" due to the "over representation of the seriousness" of his criminal history based upon the "minimal significance" of certain prior offenses. We recognize the fact that driving without a license is a relatively minor infraction within the broader context of the criminal law, however this court is without "the authority to review the refusal to grant a downward departure . . . unless the district court determined it lacked authority to consider a particular mitigating factor." United States v. Correa, 167 F.3d 414, 417 (8th Cir. 1999). Here it is clear that the district court considered the defendant's objections to the Presentence Report as over representing the seriousness of his criminal history and found that Category V was an adequate representation of the severity of Eusebio Lopez-Arce's criminal history. There is nothing to indicate the district court believed it lacked the authority to depart, and we therefore lack the jurisdiction to review its refusal to do so. See id.

Finally, Eusebio Lopez-Arce argues that the district court erred in refusing to grant a reduction based upon his minimal or minor role in the crime under United States Sentencing Guideline § 3B1.2. A district court's determination of whether a defendant was a minor or minimal participant may only be reversed if clearly erroneous. Id. at 416. It is the defendant's burden "to prove that he warrants the reduction." Id. We conclude that the district court's finding that Eusebio Lopez-Arce was an average participant in the offenses charged is not clearly erroneous.

A minimal participant role reduction is "intended to cover defendants who are *plainly* among the least culpable of those involved in the conduct of a group." U.S.

Sentencing Guidelines Manual § 3B1.2 note 1 (emphasis added). The guidelines also provide that "the downward adjustment for a minimal participant will be used infrequently." Id. at note 2 (describing a minimal participant as, for instance, a defendant whose sole role in a very large drug conspiracy was to unload a single shipment). A minor participant is one "who is less culpable than most other participants, but whose role could not be described as minimal." Id. at note 3.

> The mere fact that a defendant is less culpable than his codefendants does not entitle defendant to "minor participant" status. Whether a downward adjustment is warranted is determined not only by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable, but also by measuring each participant's individual acts and relative culpability against the elements of the offense.

United States v. Snoddy, 139 F.3d 1224, 1228 (8th Cir. 1998) (quoting United States v. Padilla-Pena, 129 F.3d 457, 471 (8th Cir. 1997), cert. denied, 524 U.S. 905 (1998), and cert. denied, 524 U.S. 906 (1998)).

The record supports the district court's holding that Eusebio Lopez-Arce was a willing participant in the conspiracy, undeserving of a minor or minimal role reduction. Evidence introduced at trial showed that Payan-Valencia went to the defendant's residence immediately prior to one of the cocaine and both methamphetamine deals. Similarly, Pacheco-Sanchez was followed to the defendant's residence just prior to his arrest, and the testimony of the surveillance officer was that Pacheco-Sanchez entered Eusebio Lopez-Arce's apartment without a coat on and returned only ten minutes later wearing a coat and apparently attempting to hide something underneath. Furthermore, Eusebio Lopez-Arce was the only charged co-conspirator who was in possession of any of the buy money given to Payan-Valencia in exchange for the half-pound of methamphetamine purchased by

-13-

Deputy Martin on January 18, 2000. All this allows the reasonable inference that Eusebio Lopez-Arce was the source of at least some of the cocaine and all of the methamphetamine charged in the conspiracy. As the source, the defendant was not entitled to a reduction for playing a minimal or minor role in the conspiracy, and the district court's refusal to grant such a reduction is therefore not clearly erroneous.

Eusebio Lopez-Arce also cites Apprendi v. New Jersey, 530 U.S. 466 (2000), in his appeal for a role reduction of the total base severity level. His reliance upon Apprendi is misplaced.

> The rule of Apprendi only applies where the non-jury factual determination increases the maximum sentence beyond the statutory range authorized by the jury's verdict. If the non-jury factual determination only narrows the sentencing judge's discretion within the range already authorized by the offense of conviction, such as with the mandatory minimums applied to [the defendant], then the governing constitutional standard is provided by [McMillan v. Pennsylvania, 477 U.S. 79 (1986)]. As we have said, McMillan allows the legislature to raise the minimum penalty associated with a crime based on non-jury factual findings, as long as the penalty is within the range specified for the crime for which the defendant was convicted by the jury. Apprendi expressly states that McMillan is still good law, though limited in application, and McMillan controls that aspect of this case.

United States v. Aguayo-Delgado, 220 F.3d 926, 933-34 (8th Cir. 2000). Therefore, given that Eusebio Lopez-Arce's sentence of 235 months imprisonment is less than the twenty year statutory maximum proscribed under 21 U.S.C. § 841(b)(1)(C), Apprendi is inapplicable.

-14-

## III. Conclusion

For the reasons set forth above, we AFFIRM.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT