# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2873

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Missouri |
| Charles E. Callaway, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  January 15, 2002
Filed:   February 14, 2002 (Corrected: 02/27/02)

_____

Before WOLLMAN,[1] Chief Judge, HANSEN, Circuit Judge, and OBERDORFER,[2] District Judge.

_____

OBERDORFER, District Judge.

_____

[1]The Honorable Roger L. Wollman stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on January 31, 2002.  He has been succeeded by the Honorable David R. Hansen.

[2]The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

Charles Callaway pled guilty to one count of aiding and abetting in the theft of explosives in violation of 18 U.S.C. § 844(1) and 2. He appeals the sentence imposed by the district court.[3] We affirm.

I.

On September 22, 1999, Charles Callaway, the defendant, wrote a bond for Brendon Bennett. He told Bennett that he needed to be paid the $800 for the bond before his boss returned from out of town. On September 27, 1999, Bennett and two other men, in an attempt to raise the money to pay Callaway, went to the Martin Marietta quarry in Greenwood, Missouri, with the intention of stealing explosives, for which they believed they had a buyer. When first at the quarry, they broke into a trailer and stole two bags of an explosive known as Anfo. Then, unable to break into a bunker where more explosives were stored, they went to Callaway's house to borrow a drill. Callaway loaned them his drill, knowing what it would be used for and after wiping off his fingerprints. The other men then returned to the quarry, broke into the bunker, and stole additional explosives – more Anfo and two other explosives, known as Slurran and Detagel. Later that week, one of the men involved in the theft told Callaway that they had not been able to find a buyer for the explosives. Callaway agreed to help in finding a buyer, and he took possession of one tube of Detagel and the lid from one box of Detagel. Callaway then disposed of both in a dumpster behind a strip mall.

Callaway contacted at least three prospective buyers. One of those buyers notified the police. Upon being interviewed, Callaway told the police who had stolen the explosives, led the police to a location where he had received the one tube of Detagel, and showed the police the dumpster where he had disposed of it. Further

---

[3] The Honorable Howard Sachs, District Judge, United States District Court for the Western District of Missouri.

investigation by the police revealed that the remaining explosives were stored in a shed behind a house, in the trunk of a car parked in an apartment building's parking lot, and in the bedroom of an apartment building whose occupants were burning candles.

On February 2, 2001, Callaway entered a plea of guilty to one count of aiding and abetting in the theft of explosives. A presentence investigation report recommended an offense level of 14, a criminal history level of VI, and a sentencing range of 37-46 months. In response, Callaway filed a motion to reduce his offense level on the ground that he was either a "minimal" (a 4-level reduction) or a "minor" (a 2-level reduction) "participant in any criminal activity." U.S.S.G. § 3B1.2. The government filed a motion seeking an upward departure on the ground that the "offense posed a substantial risk of death or bodily injury to multiple individuals." U.S.S.G. § 2K1.3, cmt. n.10. After a sentencing hearing, the district court denied Callaway's motion to reduce his offense level, and resolved several other disputes not relevant to this appeal, resulting in an offense level of 14, a criminal history level of III, and a sentencing range of 21-27 months. However, the district court then granted the government's motion for an upward departure and imposed a sentence of 42 months imprisonment.

On appeal, Callaway challenges the district court's refusal to reduce his offense level for "minor" or "minimal" participation, its decision to upwardly depart, and its imposition of a 42-month sentence.

II.

A.    Mitigating Role  (U.S.S.G. § 3B1.2)

On appeal, Callaway challenges the district court's conclusion that he is not entitled to a reduction in his offense level for having been a minimal or minor

participant in any criminal activity.  However, "[a] district court's determination of whether a defendant was a minor or minimal participant may only be reversed if clearly erroneous." *United States v. Lopez-Arce*, 267 F.3d 775, 784 (8th Cir. 2001); *see United States v. Alverez*, 235 F.3d 1086 (8th Cir. 2000); *United States v. Correa,* 167 F.3d 414, 416 (8th Cir.1999).[4]

Section 3B1.2 of the Sentencing Guidelines provides that a defendant's offense level should be decreased by four (4) levels "[i]f the defendant was a minimal participant in any criminal activity," and by two levels "if the defendant was a minor participant in any criminal activity."  U.S.S.G. § 3B1.2(a) & (b).  The reduction for minimal participation "applies to a defendant who plays a minimal role in concerted activity.  It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group.  Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." *Id.* cmt. n.1 "It is intended that the downward adjustment for a minimal participant will be used infrequently.  It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marijuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs." *Id.* cmt. n.2.  "A minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal."  *Id.* cmt. n.3. Generally, these adjustments are appropriate only "for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average

---

[4]*But cf. United States v. Snoddy*, 139 F.3d 1224, 1227 n.1 (8th Cir. 1998) (stating that "the district court's determination whether to grant a two-level reduction for 'minor' participation or a four-level reduction for 'minimal' participation is reviewed for abuse of discretion" but "factual determinations concerning a defendant's role in an offense are reviewed for clear error").  We need not resolve any conflict between these two approaches here because they lead the same outcome.

participant. The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, involves a determination that is heavily dependent upon the facts of the particular case." *Id.* cmt. background. In applying this Guideline, this Court has observed that:

> The mere fact that a defendant is less culpable than his codefendants does not entitle defendant to "minor participant" status. Whether a downward adjustment is warranted is determined not only by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable, but also by measuring each participant's individual acts and relative culpability against the elements of the offense.

*United States v. Snoddy,* 139 F.3d 1224, 1228 (8th Cir.1998) (quoting *United States v. Padilla-Pena,* 129 F.3d 457, 471 (8th Cir.1997)).

"It is the defendant's burden 'to prove that he warrants the reduction.'" *Lopez-Arce*, 267 F.3d at 784 (quoting *Correa*, 167 F.3d at 416). In denying Callaway's motion for a minimal or minor participant reduction the district court explained:

> [O]f course it's true that the people actually on the scene of the crime were the three thieves rather than the defendant.
>
> The defendant, though, had some role in initiating the crime and in making it possible for the crime to occur by supplying the drill, and then seems to have been perhaps more active than the thieves in pressuring the thieves, to the extent the evidence refers to this, being sure there were efforts made to seek a buyer for the explosives. And of course his motive was to get the money, but it clearly – we're way beyond minimal participation.
>
> And it's certainly arguable that's minor participation, but it seems to me that the guy in the background that's creating the pressure, participating to the extent that the defendant did should not be given a downward departure.

So I will, although I'm the one that sort of fed the idea to counsel, I will deny the motion.

(Sentencing Hearing on July 17, 2001, at 13-14.) The district court also stated that its ruling was based on the rationale suggested by the government in its filing of June 28, 2001, which argued that "[b]y supplying the drill that defendant knew was going to be used to steal explosives, and by taking a tube of Detagel from another participant with the purpose of finding a buyer, defendant showed that he knew, in considerable detail, the scope and structure of the criminal enterprise." (Gov't Opp. filed June 28, 2001, at 2.) The government also cited the following facts as evidence of the defendant's "deep involvement":

> 1) the other participants owed defendant money; 2) they requested a drill after failing to break certain locks at the quarry; 3) defendant provided the drill, with full knowledge that it would be used to steal explosives; 4) defendant wiped his fingerprints off the drill when he provided it; 5) the other participants approached defendant when they couldn't find a buyer for the stolen explosives; 6) defendant agreed to help find a buyer; 7) defendant received a tube of Detagel explosive from the other participants as a sample to use when trying to find a buyer; 8) later improperly disposing of the explosives to avoid detection.

(*Id.* at 2-3.)

On appeal, Callaway does not challenge the accuracy of any of the facts relied upon by the district court; rather, he contends that there are other facts which support a different conclusion. In particular, he points out that (1) he never suggested to Bennett that he engage in illegal activity in order to obtain the money to pay the bond, (2) he knew nothing of the original plan to steal explosives from the quarry, (3) his sole contribution to the theft was to supply the drill, (4) he had no idea what explosives were ultimately stolen, (5) he played no role in the storage of the stolen

explosives, (6) the only explosive he ever possessed was one tube of Detagel and the lid off of a box of Detagel, and (7) he had no idea where the explosives came from.

As the government does not take issue with any of the facts cited by Callaway, the question on appeal is not the accuracy of the underlying facts, but whether the district court clearly erred in concluding that Callaway failed to prove that he was either a minimal or minor participant in the criminal activity. Although it is a close question, as even the district court acknowledged, the evidence cited by Callaway does not persuade us that the district court clearly erred. Accordingly, the district court's refusal to grant the minimal or minor participant reduction will be upheld.

B.     Upward Departure (U.S.S.G. § 2K1.3, cmt. n.10)

1.     Basis for Departure

Callaway next challenges the district court's decision to depart upwardly pursuant to section 2K1.3, application note 10, of the Sentencing Guidelines. U.S.S.G. § 2K1.3, cmt. n.10. Such a decision is to be reviewed for abuse of discretion. *See United States v. Goings,* 200 F.3d 539, 542 (8th Cir.2000); *United States v. Lewis*, 235 F.2d 394, 396 (8th Cir. 2000); *United States v. Sample*, 213 F.3d 1029, 1032 (8th Cir. 2000). A departure "is appropriate only in extraordinary cases where there exists an 'aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.'" *United States v. Sample*, 213 F.3d 1029, 1032 (8th Cir. 2000) (quoting 18 U.S.C. § 3553(b)). The first inquiry in reviewing a departure is whether the district court "bas[ed] its departure decision on a factor that is specifically encouraged, discouraged, or forbidden by the Sentencing Guidelines." *Id.* "If the factor is encouraged as a basis for departure by the Sentencing Commission, the district court may depart, provided that the applicable Guideline does not already take the factor into account." *Id.* (citing *Koon v. United States*, 518

U.S. 81, 96 (1996)). In considering this issue, this Court "defer[s] to the [district] court on the critical issue of whether a given factor is present to a degree not adequately considered by the [United States Sentencing] Commission." *Id.* (internal quotations omitted). If the factor is a permissible basis for departure, we will uphold the district court "as long as the factual record contains sufficient evidence to support the basis of the departure decision." *Sample*, 213 F.3d at 1033.

Before turning to the question of whether the district court abused its discretion in deciding to depart upwardly, we must resolve the parties' dispute over what was the actual basis for the departure. Section 2K1.3 of the Sentencing Guidelines provides that an upward departure, in a case involving explosives,

> may be warranted in any of the following circumstances: (1) the quantity of explosive materials significantly exceeded 1000 pounds; (2) the explosive materials were of a nature more volatile or dangerous than dynamite or conventional powder explosives (e.g. plastic explosives); (3) the defendant knowingly distributed explosive materials to a person under twenty-one years of age; or. . . (4) the offense posed a substantial risk of death or bodily injury to multiple individuals.

U.S.S.G. § 2K1.3, cmt. n.10. Callaway contends that the district court departed because it found that the explosives involved were more dangerous or volatile than conventional explosives – the second prong of application note 10. The government maintains that the upward departure was based on the fourth prong of application note 10 – the risk of death or bodily injury to more than one person. Although the record is not perfectly clear, we agree with the government. The government's motion seeking an upward departure expressly relied on the fourth prong. Moreover, although the district court's statement in open court granting that motion was perhaps somewhat confusing (*see* Sentencing Hearing on July 17, 2001, at 20-21 ("I accept the testimony that there was very unusual danger, that is more danger than if we'd been dealing with some conventional explosive such as dynamite, although I'm not

an explosive expert, but I do rely on the testimony that I've heard, and the unusual danger occurred both at the apartment where the explosives were stored and also at the dumpster where one item was disposed of by the defendant himself."")), in its judgment, the district court clearly relied on the fourth prong (*see* R. at 18 (explaining that "[t]he Government's upward departure motion under application note 10, 2K1.3, will be granted because of the unusual dangers at the apartment where the explosives were stored and in defendant's disposing of one item in a Dumpster.")). The statement in the judgment, read in light of the government's motion, convinces us that the district court's primary concern, the "unusual danger" basis for the upward departure, was the risk of death or bodily injury created by the location and storage of the stolen explosives, apart from their volatility or potential exposive force relative to dynamite.

Next, we turn to Callaway's argument that his case does not fall outside of the "heartland" of stolen explosives cases in terms of the risk of death or bodily injury. Callaway's argument is misplaced. Here, the district court's departure was clearly based on a factor "specifically" encouraged by the Sentencing Guidelines, and not taken into account by the applicable Guideline. *See* U.S. S.G. § 2K1.3 & cmt. n.10. In those circumstances, the Supreme Court has made clear that the "heartland" analysis is inapplicable. *See Koon v. United States*, 518 U.S. 81, 96 (1996). Accordingly, there is no question that the risk of death or bodily injury is a permissible basis for departure.

There remains Callaway's argument that the record contains insufficient evidence to support a departure on this ground. The critical facts, according to Callaway, are that:

> There was no evidence that usually stolen or illegally possessed explosives are stored more safely, or in a more secluded place. There was no evidence . . . that the nature of these explosives was more dangerous than conventional

explosives. Agent Carlson testified that one tube of Detagel, in ATF's in-house training, would break the windows and open the doors of a car. He did not say that the car would be completely destroyed, left unrecognizable, or that a hole would remain where the car had once stood. Even when questioned about the danger of the Detagel, Special Agent Carlson was somewhat ambiguous, stating it "could" detonate upon compression and "could have" caused damage to whatever was around the garbage truck.

(Def. Br. at 13.) In response, the government points out that there is uncontroverted evidence in the record that (1) there were explosives stored in an apartment complex where the residents were burning candles for lights, (2) when the explosives in that apartment were discovered they were next to a sleeping person, (3) there were explosives stored in the trunk of a car parked outside the apartment complex, (4) there were explosives stored in a shed behind a house in a populated residential neighborhood and in close proximity to electrical and gas lines, (5) the defendant disposed of his tube of Detagel in a trash dumpster in a high traffic area near a strip mall, (6) Detagel can be detonated through heat, friction or shock, (7) the amount of explosives could have caused major structural damage to a building the size of the federal courthouse in Kansas City, Missouri, (8) a tube of Detagel could destroy the interior of a vehicle and possible explode the gas tank, and (9) a tube of Detagel compressed in a trash truck would likely explode. Looking at the evidence cited by the government, and not disputed by Callaway, we cannot say that the district court abused its discretion in deciding to upwardly depart.

    2.    <u>Extent of Departure</u>

Finally, Callaway claims that even if the decision to depart was justified, the degree of departure was unreasonable. Callaway's sentencing range under the Guidelines was 21-27 months. The district court sentenced him to 42 months, explaining:

I'll use a 42-month sentence which is significantly below what the government was originally asking. . . .   But it does seem to me that whatever one would consider to be a relatively severe sentence is needed to discourage and deter very dangerous activity in this case, which has been established to my satisfaction in the testimony that I heard before the recess for briefing.

(Sentencing Hearing of July 17, 2001, at 29.)  We review the reasonableness of the extent of an upward departure for abuse of discretion. *Sample*, 213 F.3d at 1034. "In conducting our review, we are mindful that the district court's decision on this matter is quintessentially a judgment call and we respect the district court's superior feel for the case." *Id.* (internal quotations omitted).  This deference is particularly appropriate where there is only one other reported case involving a departure on this ground.  *See United States v. Gacnik*, 50 F.3d 848, 853 (10th Cir. 1995) (upward departure of three levels upheld).   While it is true that *Gacnik* involved a smaller departure, that alone does not persuade us to disparage the judgment of the district court here.  That said, we note that the extent of the district court's departure is large, particularly given Callaway's limited role in choosing, and knowledge of, the storage locations of the vast majority of the explosives.  Nonetheless, we are mindful that the district court heard the evidence first-hand and was intimately familiar with the relevant facts and circumstances.  Thus, even though we can speculate that one or more of us might have reached a different outcome were the decision ours to make in the first instance, we are not persuaded that the district court's departure was unreasonable or an abuse of discretion.

### III.

For the reasons stated above, we affirm the sentence of the district court.

A true copy.

ATTEST:

-11-

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.